## UNITED STATES DISTRICT COURT
## FOR THE EASTERN DISTRICT OF PENNSYLVANIA

| | |
|---|---|
| **STUDENT DOE**, suing under fictitious name for privacy reasons, by and through STUDENT DOE'S parents, **MOTHER DOE** and **FATHER DOE**, suing under fictitious names to protect the identity and privacy of **STUDENT DOE**, their child,<br><br>and<br><br>**MOTHER DOE** and **FATHER DOE**, individually and on their own behalf,<br><br>    Plaintiffs,<br><br>v.<br><br>ABINGTON FRIENDS SCHOOL, RICHARD NOURIE, DOMINIQUE M. GERARD, LATOYA MILLER AND KEVIN RYAN,<br><br>    Defendants. | CASE NO.:<br><br>JURY TRIAL DEMANDED |

## CIVIL ACTION COMPLAINT

Plaintiffs, Mother Doe, Father Doe and Student Doe, by and through their undersigned attorneys, hereby complain of Defendants, Abington Friends School ("AFS") and Richard Nourie, Dominique M. Gerard, La Toya Miller and Kevin Ryan, ("Individual Defendants"), as follows:

**INTRODUCTION**

1.      "Sunlight is said to be the best disinfectants."[1] AFS and the Individuals Defendants *speak* of holding members of the AFS Community "up to the light." In truth, AFS demands darkness. Those who resist are banished. Nevertheless, Student Doe persists -- as have a *few* other

_____
[1] Supreme Court Justice Louis Brandeis.

"Does" with the courage and resources to challenge the unlawful and shocking conduct to which AFS subjects certain of its students.[2]

2.      AFS possesses the well curated brand of a genteel Quaker school that values and upholds simplicity, peace, integrity, community, equality, stewardship in the daily life and education of its students, and honors the values of social justice, social action and reflective practices. Indeed, that is what Plaintiffs believed, but it is far from reality. In fact, AFS is quick to turn on anyone who is the light to its darkness.

3.      For years, Student Doe was the victim of pervasive abuse, bullying, harassment, assault, battery, false imprisonment, verbal abuse regarding physical characteristics, and discrimination on the basis of sexual orientation – all Major Violations of AFS' Community Standards.

4.      And, for years, AFS and the Individual Defendants paid lip service to Plaintiffs, promising to fulfill its obligations – moral, equitable and, relevant and applicable here, *pursuant to the Parties' contract, which expressly incorporates AFS' Upper School Family Handbook* – to implement the investigatory and disciplinary procedures and processes to which the Parties agreed.

5.      Despite Student Doe enduring years of abuse – constituting Major Violations of AFS' Community Standards as defined by AFS' applicable Handbooks – as late as September 2020, AFS finally, affirmatively and explicitly disavowed it obligations, in breach of the Parties' contract, by refusing to apply the required disciplinary procedures, mandated by the AFS Handbook, to Student Doe's abusers and, in addition to the other violations of law alleged herein, threatening to summarily expel Student Doe because Student Doe shed light on the reality of AFS' by revealing publicly that Student Doe had been the victim of Major Violations of AFS'

_____

[2] Student Doe is not alone. *See, e.g., Doe v. Abington Friends School*, 2:22-cv-00014-GJP (E.D.P.A.).

Community Standards for which AFS took *no* action, including failing to investigate those allegations, as required by the AFS Handbook and the contract between Plaintiffs and AFS, spoke the truth about that abuse, and spoke the truth about AFS' failure to honor its contract with Plaintiffs and inexcusable disregard of its promise to protect Student Doe from those who had abused Student Doe <u>on AFS' campus</u> and off, including as carelessly organized *by* AFS.

6.      Due to AFS' unlawful conduct, as alleged more fully herein, Plaintiffs had no rational choice but to withdraw Student Doe from AFS just as Student Doe was to begin junior year. In addition to the significant physical, emotional, and psychological harm that Defendants' conduct caused Student Doe, Student Doe was deprived of the things that *all* Student Doe's abusers at AFS enjoyed – a prom, a graduation ceremony, an official high school diploma, long lasting teenage friendships, and the opportunity to enjoy a high school education. Instead, Plaintiffs paid nearly $80,000 to AFS to have Student Doe's life and physical, emotional and psychological wellbeing severely damaged so that AFS could maintain the *perception* that it holds students, such as Student Doe, "up to the light" when, in fact, it affirmatively seeks to conceal them in darkness and, when it can no longer do so, breaches its legal obligations and casts them out of AFS altogether.

7.      As a result, Plaintiffs sue AFS, a recipient of federal financial assistance as a 501(c)(3) organization, for breach of contract, discrimination in violation of Title IX, 20 U.S.C. § 1681 *et seq*, and discrimination in violation of Section 504 of the Rehabilitation Act of 1973, as amended, 29 U.S.C. § 794, and the Individual Defendants for negligent infliction of emotional distress.

**PARTIES**

**Plaintiffs**

8.  Student Doe. Student Doe entered Abington Friends School ("AFS") as a member of the Freshman class for the academic year 2018-2019 and withdrew after re-enrolling, one day prior to the commencement of the first day of classes for the 2020-2021 academic year. At the time of the events alleged herein, Student Doe was a minor. Student Doe is not now a minor but has not reached the age of 20 as of the filing of this complaint.[3]

9.  Mother Doe. Mother Doe is the mother of Student Doe, a resident of this judicial district.

10. Father Doe. Father Doe is the father of Student Doe, a resident of this judicial district.

**Entity Defendant**

11. Abington Friends School. AFS is an independent, non-public school incorporated under the laws of the Commonwealth of Pennsylvania with a campus and principal place of business located at 575 Washington Lane, Jenkintown, Pennsylvania 19046. At all times pertinent to the allegations herein, AFS operated an "Upper School" which provided education services for grades 9 through 12.

---

[3] Pennsylvania's Minority Tolling Statute, 42 Pa.C.S. § 5533(b)(1), provides in relevant part that minority status shall not count as part of the statute of limitations period. *Nicole B. v. Sch. Dist. of Philadelphia*, 237 A.3d 986, 989-90 (Pa. 2020). Accordingly, the two year statute of limitations for Plaintiffs' Title IX, Section 504, and Negligent Infliction of Emotional Distress claims did not begin until Student Doe turned 18, and have not yet lapsed. *See Weis-Buy Services, Inc. v. Paglia*, 411 F.3d 415, 422 (3d Cir. 2005) ("when a federal law provides the basis for the cause of action, but fails to supply a statute of limitations, we must borrow an appropriate statute of limitations from the law of the forum state. We also incorporate relevant state tolling rules.") (citations omitted).

12.     AFS was the recipient of federal funds, including a Paycheck Protection Program ("PPP") loan disbursed pursuant to the Coronavirus Aid, Relief, and Economic Security Act (CARES ACT) in 2020.

**Individual Defendants**

13.     Richard Nourie ("Nourie"). Nourie is the Head of School of AFS. As Head of School, Nourie's responsibilities include overseeing all aspects of the functioning of AFS' Upper School. Nourie is a resident of Philadelphia.

14.     Dominique M. Gerard ("Gerard"). Gerard is a former Upper School Director of AFS. At all times pertinent to the allegations herein, Gerard served as AFS' Upper School Director. As AFS' Upper School Director, Gerard was responsible for all aspects of the functioning and operation of AFS' Upper School and was a direct report to Nourie. Gerard is a resident of Philadelphia.

15.     LaToya Miller ("Miller"). Miller is former Upper School Dean of Students of AFS. At all times pertinent to the allegations set forth herein, Miller had a substantial role in selecting and setting students' academic schedules at AFS, including that of Student Doe and "Student Perpetrator" (defined below) during AFS' 2019-2020 academic year. During AFS' 2019-2020 academic year, Miller co-taught at least one course at AFS sometimes referred to within AFS as a "Ten-Sem" class. Miller reported to Gerard as Head of AFS Upper School and Nourie as AFS Head of School. Miller is a resident of Philadelphia.

16.     Kevin Ryan ("Ryan"). Ryan is a Middle and Upper School Counselor at AFS. Ryan served as a Middle and Upper School Counselor at all times pertinent to the allegations set forth herein. Ryan is a resident of Philadelphia.

17.     Nourie, Gerard, Miller and Ryan are, collectively, the Individual Defendants.

5

18. At all times pertinent to the allegations set forth herein, AFS acted by and through its employees, servants and agents, including, without limitation, Nourie, Gerard, Miller and Ryan, who at all times were acting within the course and scope of their employment, service and agency, for and on behalf of AFS. Plaintiffs' claim for negligent infliction of emotional distress is pled in the alternative to Plaintiffs' claim for breach of contract to the extent that an Individual Defendant was not acting in the scope of his or her employment by AFS as to the acts alleged herein.

### Material Non-Party

19. Student Perpetrator. Student Perpetrator was a member of AFS's 2022 Upper School class at all times pertinent to the allegations in this Complaint. Upon information and belief, Student Perpetrator is a resident of this judicial district and attends college in Illinois.

### JURISDICTION AND VENUE

20. Because this Complaint seeks relief under Title IX, 20 U.S.C. § 1681(a) *et seq,* and section 504 of the Rehabilitation Act of 1973, as amended, 29 U.S.C. § 794, this Court has subject matter jurisdiction over Counts II and III pursuant to 28 U.S.C. §1331, and over Counts I and IV pursuant to 28 U.S.C. §1367 under the doctrine of pendent or supplemental jurisdiction.

21. This Court has personal jurisdiction over AFS as it is located in and conducts business in this judicial district.

22. This Court has personal jurisdiction over the Individual Defendants as they reside in this judicial district and all of their acts, as alleged herein, occurred in this judicial district.

23. Venue is proper in this district under 28 U.S.C. §1391(b)-(c), as all Defendants reside in this district and all of the events or omissions giving rise to Plaintiffs' claims occurred in this district.

6

**STATEMENT OF FACTS**

**<u>Abington Friends School</u>**

24.     Abington Friends School is a private co-educational, K-12 private school.

25.     AFS purports to incorporate the Quaker testimonies of simplicity, peace, integrity, community, equality and stewardship into the daily life and education of its students.

26.     AFS has failed to practice these Quaker testimonies as to Student Doe.

27.     In addition to Quaker testimonies, AFS purports to honor the value that Quakers place on social justice, social action and reflective practices.

28.     AFS has failed to honor these values as to Student Doe.

29.     AFS purports to set a high standard for the behavior of its community members both on campus and off as dictated by AFS' Upper School Family Handbooks. AFS's Upper School Family Handbooks for the periods 2018-2019, 2019-2020 and 2020-2021, are attached hereto as Exhibits A, B and C, respectively.

30.     For example, AFS's 2019-2020 Upper School Family Handbook ("AFS Handbook") defines as "Major Violations of Community Standards," among other things: "dishonesty in word or deed (when the adult determines that the act of dishonesty is a major violation)"; "bullying, harassment, or sexual harassment in person or on social media"; "assault or sexual assault"; "fighting or acts of violence"; "a pattern of repeated violations of minor school rules." *See e.g.*, Exhibit B, p. 16; *see also* Exhibit A, p. 33; Exhibit C, p. 17.

31.     The AFS Handbook provides that "[w]hen a student has violated a major community standard, the Dean of Students [Miller] will convene the student-faculty Discipline Advisory Council ('DAC') to recommend appropriate consequences to the Upper School Director or Head of School."

32.     Despite reports of assault, battery, harassment, bullying, false imprisonment, and discrimination on the basis of sexual orientation of Student Doe, AFS improperly and intentionally, in breach of its contract(s) with Plaintiffs, failed to follow the policies and procedures required by the AFS Handbook, including the convening of the student-faculty Discipline Advisory Council. AFS also breached its contracts with Plaintiffs by refusing to apply and implement the terms and required investigatory and disciplinary procedures set forth in the AFS Handbook to the conduct by Student Doe which, regardless, as alleged below, does not constitute a violation of *any* AFS Community Standard and, instead, attempted to subject Student Doe to summary dismissal without the application of the procedures required by the AFS Handbook and, exacerbating AFS's breach by failing and refusing to provide any guidance on what conduct may result in summary dismissal, effectively resulting in an arbitrary and capricious process governing Student Doe. AFS's enrollment contracts explicitly incorporate AFS' Upper School Family Handbooks. For example, AFS's enrollment contract for the academic year 2020-2021 states "[w]e agree to accept the rules and regulations of Abington Friends School as stated in its current handbook (available online) and other publications and notices." *See* Exhibit D (exemplar of AFS enrollment contract for the academic year 2020-2021). Upon information and belief, AFS utilized uniform enrollment contracts for its Upper School and for each academic year from 2018-2019 through and including 2020-2021, which incorporated AFS' Upper School Family Handbook, including the contracts Plaintiffs entered into with AFS.

33.     Additionally, throughout Student Doe's tenure at AFS, AFS failed to recognize its legal obligations as a recipient of federal funds, as well as pursuant to its own Upper School Handbooks and other written school policies, to support Student Doe, who is a qualified individual with disabilities (including Anxiety). These failures included AFS's (1) failure to evaluate Student

Doe, (2) failure to convene a meeting to determine what accommodations Student Doe needed to access the school's programs, (3) failure to develop, share, and implement a written plan during Student Doe's tenure at AFS that provided for the accommodations Student Doe required as a result of Student Doe's disabilities, and (4) failure to provide accommodations and supplemental services to Student Doe, constituting discrimination under Section 504 of the Rehabilitation Act.

34.    Additionally, as alleged below, AFS, through at least Gerard and Ryan, violated Student Doe's rights pursuant to Title IX due to Student Doe's declared sexual orientation.

**Student Doe Joins the AFS "Community"**

35.    Student Doe entered AFS's Class of 2022 as a freshman in the academic year 2018-2019.

36.    Prior to attending AFS, Student Doe attended a private non-denominational middle school in which physical fights and significant conflict among members of the male student body occurred and were frequently not regulated by the administration. Although Student Doe otherwise generally enjoyed Student Doe's middle school as of 2018, Student Doe explored AFS for high school to, in part, avoid the often-unchecked disciplinary conduct at Student Doe's middle school.

37.    Student Doe decided to apply to AFS for their 9th grade school year because Student Doe desired a change from Student Doe's middle school environment and wanted to experience the benefits of a private Quaker school, which held itself out as providing a socially responsible and academically rigorous education, a diverse student body, and a focus on fostering the ideals of community, spirituality, responsibility and stewardship.

38.    Following an in-person interview of Student Doe and Student Doe's father, an in-person tour of the AFS Upper School and attendance at AFS's "Open House" by Student Doe and Father Doe, Student Doe was admitted to the AFS Upper School for the 2018-2019 academic year.

39.     Student Doe, Mother Doe and Father Doe on the one hand, and AFS on the other, entered into a binding enrollment contract for the 2018-2019 academic year, and later, as a returning family, they again entered into another binding enrollment contract for the 2019-2020 academic year and for the 2020-2021 academic year.

40.     By entering into these AFS enrollment contracts, which reference and incorporate the terms of the AFS Handbooks and other written school policies, and by paying the required tuition, which was approximately $34,000.00 for the 2018-2019 school year and $39,000.00 for the 2019-2020 school year, Plaintiffs became entitled to all the rights conferred by the promises in the enrollment contracts, the AFS Handbooks and other written school policies, and AFS was contractually bound to keep those promises to the Plaintiffs.

41.     Upon entering AFS, Student Doe was an optimistic, happy, healthy 14 year-old, excited to embark on Student Doe's high school career.

42.     As a result of shocking, pervasive and persisting harassment and bullying by Student Perpetrator on and off of AFS's campus, of which AFS had actual knowledge yet failed investigate, prevent, remedy, implement the required procedures and discipline, in violation of its contracts with Plaintiffs, consistent with the terms of the AFS Handbook, Plaintiffs were severely damaged.

**Student Doe's Relationship with Student Perpetrator**

43.     In Student Doe's freshman year, 2018-2019, Mother Doe and Father Doe paid a fee to AFS for Student Doe to travel to and from AFS on its in-house school bus option for families commuting from Northwest Philadelphia, known as the Northwester bus.

44.     Beginning in September 2018, on most school days, Student Doe travelled to and from AFS on its Northwester bus.

45.     Likewise, on most school days Student Perpetrator, who resided in the Northwest section of Philadelphia, also travelled to AFS on the Northwester bus. According to Google Maps, Student Perpetrator's home is a 10-minute bicycle ride from the home in which Student Doe resided during Student Doe's matriculation at AFS; by car, the trip is approximately 6 minutes.

46.     During Student Doe's freshman year, in or about the Fall of 2018 or Winter of 2019, Student Doe began a dating relationship with Student Perpetrator.

47.     During the dating relationship, Student Doe and Student Perpetrator went on several dates including for meals and to the movies.

### Student Perpetrator's Persistent Abuse of Student Doe On and Off of AFS's Campus

48.     During course of the relationship between Student Doe and Student Perpetrator -- on and off of the AFS campus -- Student Perpetrator persistently assaulted, battered, psychologically abused, physically abused, verbally abused, taunted, restrained, falsely imprisoned, bullied and harassed Student Doe.

49.     Student Perpetrator frequently recruited AFS classmates to assist, participate in and, at times, video record the misconduct alleged above, as perpetrated upon Student Doe on AFS's campus.

50.     Despite having actual knowledge of these Major Violations of AFS' Community Standards, AFS did not attempt to limit, restrain, prevent or otherwise stop the conduct of Student Perpetrator or any or any other AFS student directed toward Student Doe as described herein. To the contrary, AFS demonstrated deliberate indifference to the situation.

51.     For example, on the AFS campus, with and without physical restraint of Student Doe and without Student Doe's consent, Student Perpetrator repeatedly slapped Student Doe in

11

the face without Student Doe's consent, slapped Student Doe with pieces of cheese obtained from AFS's cafeteria and stuffed fruit (to which Student Perpetrator knew Student Doe had a strong aversion) into Student Doe's mouth.

52.     On one or more occasions, on the AFS campus, Student Perpetrator recruited fellow AFS classmates to video record Student Perpetrator slapping Student Doe in the face with pieces of cheese, without Student Doe's consent.

53.     Student Doe was confused, humiliated and traumatized by Student Perpetrator's threats to Student Doe and Student Doe's family and the assault, battery, physical abuse, psychological and emotional abuse, verbal abuse, taunts, physical restraint, false imprisonment and general harassment by Student Perpetrator and other AFS students that he recruited to participate in his campaign – including repeatedly on the AFS campus, caused Student Doe to suffer, including extreme anxiety.

54.     As a result of Student Perpetrator's conduct, Student Doe no longer wished to date, be in what was then an abusive relationship or otherwise interact with or communicate Student Perpetrator. However, because Student Perpetrator and Student Doe both attended AFS as freshmen, it was impossible not to, at a minimum, see Student Perpetrator unless Student Doe terminated Student Doe's matriculation from AFS to avoid Student Perpetrator.

55.     On numerous occasions Student Doe attempted to end Student Doe's then (abusive) "relationship" with Student Perpetrator.

56.     Student Perpetrator repeatedly resisted all efforts by Student Doe to terminate their "relationship" which Student Perpetrator characterized to Student Doe as a real relationship and which Student Doe did not. However, Student Perpetrator insisted that Student Doe maintain the

appearance of an actual relationship between the two. To prevent Student Doe from denying the fact of their relationship publicly, Student Perpetrator repeatedly threatened Student Doe.

57.     Specifically, on more than one occasion, Student Perpetrator threatened Student Doe that if Student Doe publicly terminated or otherwise denied the fact of their "relationship" he would "rape" Student Doe's minor sister.

58.     Terrified for the safety and well-being of Student Doe's younger minor sister and mindful of Student Perpetrator's erratic and violent nature, Student Doe perceived Student Perpetrator's threats to be credible and continued to maintain the outward *appearance* that Student Doe was in a "relationship" with Student Perpetrator when, in fact, Student Doe was not.

59.     Student Perpetrator's conduct became increasingly erratic. Eventually, Student Perpetrator's conduct became so unbearable, that Student Doe officially and publicly terminated Student Doe's apparent, but not actual, "relationship" with Student Perpetrator, publicly and to Student Perpetrator.

60.     Student Perpetrator refused to accept Student Doe's termination of their relationship. Thereafter, Student Perpetrator escalated his persistent campaign of abuse, harassment and bullying of Student Doe, including repeated instances on AFS's campus, a context in which AFS exercised substantial control.

61.     In or around March 2019, Student Doe began to asked Mother Doe and Father Doe to drive Student Doe to and from AFS each day so that Student Doe did not have to ride AFS' Northeaster bus.

62.     In or about March 2019, Student Doe and Mother Doe spent the weekend away from home. As they were preparing for the drive home, Student Perpetrator called Student Doe.

13

63.     Mother Doe heard Student Doe's distressed voice from the next room and went in to check on Student Doe. Mother Doe observed Student Doe as visibly shaken, on a FaceTime call with Student Perpetrator and waved Mother Doe. Initially, Mother Doe left the room but stayed just outside the door and could hear Student Doe's side of the conversation repeatedly saying, truthfully, "[Student Perpetrator], I did not cheat on you."

64.     During the conversation, Student Perpetrator repeatedly hung up on Student Doe without warning and would then call right back. The interaction was extremely distressing to Mother Doe who went entered the room and collected Student Doe to drive home early.

65.     Because Student Perpetrator repeatedly called Student Doe, the FaceTime conversation between Student Perpetrator and Student Doe continued in the car ride home. During the call, Student Perpetrator repeated his pattern of hanging up on Student Doe and calling back. Mother Doe counseled Student Doe not to answer hoping to give Student Perpetrator an opportunity to cool off.

66.     As the ride continued, Student Doe explained that Student Doe had not cheated on Student Perpetrator and had no idea why he was making the accusation.

67.     Student Perpetrator continued to call, and Mother Doe eventually suggested that Student Doe answer for the purpose of asking Student Perpetrator to calm down so Student Doe could explain that Student Doe had not cheated on Student Perpetrator, that he would have to decide for himself what to believe, but Student Doe could not continually reassure him or be subjected to repeated harassing calls.

68.     As the calls continued, Student Doe answered and explained to Student Perpetrator as suggested by Mother Doe.

69.     In response, Student Perpetrator became enraged and extremely erratic. In some of the calls, Student Perpetrator threatened significant self-harm if Student Doe "broke up" with him.

70.     Student Perpetrator began shouting at Student Doe. The call was *not* on speaker, but Student Perpetrator was shouting so loudly that Mother Doe could hear what Student Perpetrator was saying from the phone while in the car. Student Perpetrator was yelling, calling Student Doe a "bitch" and a "whore" who cheated on him.[4] Student Perpetrator would then switch to pleading desperately -- "please don't break up with me." Without giving Student Doe a chance to respond, Student Perpetrator would hang up on Student Doe and then call back immediately.

71.     Student Doe was extremely upset by Student Perpetrator's conduct and Mother Doe directed Student Doe not to answer further calls from Student Perpetrator.

72.     Student Perpetrator continued to call Student Doe repeatedly and Mother Doe directed Student Doe to let the calls go to voicemail. Student Doe remained extremely upset by Student Perpetrator's mistreatment, abuse, bullying and harassment.

73.     Mother Doe explained that Student Perpetrator's behavior was frightening and that there was no circumstance in which Student Perpetrator's behavior was acceptable or healthy. Mother Doe explained to Student Doe that Student Perpetrator needed help and that they should call his parents to inform them of their concerns. Student Doe explained that Student Perpetrator's parents knew that Student Perpetrator was unstable, and that Student Perpetrator was in therapy.  Student Perpetrator told Student Doe, however, that he would "just lie to the therapist" and then laugh about it.

---

[4] It later emerged that for all of Student Perpetrator's false allegations that Student Doe had cheated on him, Student Perpetrator admitted to Student Doe that, as a high school freshman, Student Perpetrator had cheated on Student Doe with a female 7th grade student who attended SCH Academy in Philadelphia, Pennsylvania.

74.     Student Doe revealed that Student Perpetrator would not permit Student Doe to end Facetime calls or let Student Doe hang up telephone calls even insisting that Student Doe take the phone into the bathroom to ensure that Student Doe was not speaking to someone else.

75.     During one of their FaceTime calls, Student Perpetrator's mother came into the room in which Student Perpetrator was situated. Student Perpetrator's mother could discern that Student Doe and Student Perpetrator were on a call. Student Doe could see Student Perpetrator's mother for part of the call. With Student Doe on the FaceTime call, Student Perpetrator asked his own mother, for Student Doe to witness -- if she masturbated and about his mother's masturbatory habits.

76.     After considerable resistance and harassment by Student Perpetrator, following the March 2019 telephone call, Student Doe again "ended" the "relationship" a few days later.

77.     Student Perpetrator received the news of the "breakup" very poorly.

78.     Thereafter, even though Student Doe had ended the "relationship" with Student Perpetrator, Student Perpetrator continued to harass Student Doe on AFS's campus and beyond.

79.     Upon information and belief, Student Perpetrator spread false sexual rumors about Student Doe, frequently talked about Student Doe and Student Doe's body in sexual and derogatory and demeaning ways, talked about physically attacking Student Doe, encouraged other AFS students to harass Student Doe, and talked about beating up Student Doe on AFS's campus and elsewhere with a group of other AFS students.

80.     On Friday, May 24, 2019, a holiday weekend, with only one week of school remaining, Student Perpetrator recruited several then current AFS students to participate in a campaign of harassment, verbal abuse, false imprisonment, and assault of Student Doe on the AFS campus.

81.     On May 24, 2019, Student Perpetrator and the AFS students he recruited, including Student Z (discussed below) physically surrounded Student Doe – a 15-year-old girl <u>on the AFS campus</u>. Student Perpetrator and the other AFS students restricted Student Doe's freedom of movement, called Student Doe's a "slut", "fat slut" and a "whore" and slurs targeting Student Doe's physical or other personal characteristics in a derogatory manner and assaulted Student Doe <u>on AFS's campus</u>.

82.     On May 24, 2019, Student Doe promptly reported the assault, bullying and harassment by Student Perpetrator and the other AFS student, <u>on AFS's campus</u>, to two of AFS's Upper School "Class Clerks."

83.     Despite Student Doe's prompt report of the May 24, 2019, incident and in contravention of the AFS Handbook, AFS took no action and failed to investigate or discipline Student Perpetrator or any of the other AFS students who participated in the May 24, 2019, Major Violations of AFS' Community Standards, <u>on AFS's campus</u>.

84.     As a result of the May 24, 2019 incident, Student Doe was confused, humiliated, and deeply traumatized by the conduct of Student Perpetrator and the AFS students that he recruited to participate in his campaign of assault, battery, psychological abuse, physical abuse, verbal abuse, taunts, physical restraint, false imprisonment and general harassment.

85.     Thereafter, deeply anxious and traumatized, Student Doe slowly began to reveal to Mother Doe and Father Doe the traumatizing, bullying and abusive acts of Student Perpetrator and other AFS students that took place <u>on AFS's campus</u>, and off.

86.     On August 11, 2019, in anticipation of Student Doe and Student Perpetrator attending their sophomore year together at AFS, Mother Doe and Father Doe emailed AFS's Head of School, Rich Nourie, to request a meeting. Specifically, they requested that "[w]ith the new

school year fast approaching, [they] were hoping to meet with [Nourie] to discuss an issue that arose at the end of the last school year," i.e., the assault, bullying and harassment of Student Doe by Student Perpetrator and other AFS students on AFS's campus.

87.     Before a meeting could be arranged, the 2019-2020 school year commenced. Student Doe and Student Perpetrator were assigned to an art class together. Student Doe was upset by Student Doe's assignment to a class with Student Perpetrator and asked the art teacher, Amy Diaz Newman, to arrange the seating so that Student Doe and Student Perpetrator could be seated far apart from one another because Student Doe was afraid of Student Perpetrator and suffering from anxiety. In contravention of the AFS Handbook, AFS did not place Student Doe and Student Perpetrator in separate classrooms or otherwise take steps to discipline Student Perpetrator or protect Student Doe.

88.     On September 10, 2019, Mother Doe and Father Doe met with Nourie at AFS to discuss what they then knew of the May 24, 2019 incident. Specifically, they explicitly informed Nourie that, on AFS's campus, on May 24, 2020, Student Perpetrator, along with several other AFS students, had encircled Student Doe, restricted Student Doe freedom of movement, taunted, called Student Doe offensive and sexually degrading terms, assaulted Student Doe and demanded to know why Student Doe refused to be in a relationship with Student Perpetrator.

89.     At the September 10, 2019, meeting, Mother Doe and Father Doe told Nourie that they were deeply troubled by Student Perpetrator's conduct. They also explicitly informed Nourie that it was imperative – now that Student Doe and Student Perpetrator were again in daily close proximity on AFS's campus, that AFS closely monitor Student Perpetrator's conduct *at least* as it related to Student Doe to help ensure Student Doe's emotional and physical safety, and to implement discipline. Student Doe also explicitly informed Nourie that Student Doe had reported

that Student Perpetrator threatened to rape Student Doe's minor sister if Student Doe terminated their relationship.

90.     Nourie assured Mother Doe and Father Doe that he and AFS would: (i) notify the appropriate constituents of the AFS community including Student Doe's Advisor, Margret Gurrera; AFS's Upper School Head of School, Dominique Gerard; Kevin Ryan, Upper School Counselor; and other relevant constituents; (ii) ensure that Student Doe and Student Perpetrator were monitored to avoid further incident, particularly because there were assigned to the same art class; and (iii) coordinate with Student Doe's art teacher to be vigilant regarding Student Perpetrator's conduct in their mutual art class considering his abuse of Student Doe on AFS's campus.

91.     At that time, in light of Nourie's assurances, Mother Doe and Father Doe communicated to Nourie that Student Perpetrator's conduct had had a significant negative impact on Student Doe causing Student Doe to suffer anxiety and that they expected that AFS would take appropriate action, but hoped Student Doe was no longer the target of Student Perpetrator's abuse.

92.     During the September 10, 2020 meeting, Nourie conveyed that the timing of the conversation was apt because AFS was embarking on a school-wide project to discuss bullying, harassment, and sexual harassment. Nourie conveyed that he believed that the program would help to educate AFS' faculty and student to be more aware of and sensitive to the type of abuse to which (to the extent then known to Student Doe's parents), Student Perpetrator had subjected Student Doe to on AFS's campus.

93.     Upon information and belief, conscious of the seriousness of the conduct of Student Perpetrator and the other AFS students he recruited, on AFS's campus, in or around September

2019, without informing Plaintiffs, AFS retained David Loder, Esquire, of Duane Morris to advise AFS regarding Student Doe's allegations and Student Perpetrator's conduct.

94.     By September 19, 2020, Student Doe was prescribed antidepressants to manage the stress of returning to school with Student Perpetrator.

95.     On October 31, 2019, Student Doe celebrated Halloween with friends and slept at a friend's house. However, Student Doe's much younger sister – whom Student Perpetrator threatened to rape to prevent Student Doe from ending their relationship – was at home with Mother Doe and Father Doe.

96.     At approximately 9:30 pm the doorbell of the Plaintiffs' home rang. Father Doe answered the door and was met by a sole teenage girl, approximately 5'2" with dark brown curly hair below her shoulders; she was not in costume. Mother Doe stood nearby at the doorway.

97.     The girl standing at the door flatly said "Trick or Treat." As she did, several teenagers partially emerged from hiding at the front of Plaintiffs' home. None of the teenagers were wearing costumes. A teenage boy stepped to the front and addressed Father Doe and said, "We're your daughter's friends from AFS." Father Doe asked for names so that he could convey who had stopped by. None of the teenagers – whom it is now known called themselves the "Fiends" -- responded or revealed their names.

98.     As the group was leaving and Father Doe was shutting the front door, another teen partially emerged – a tall, thin male wearing a bright pink hoodie who was also not wearing a costume.

99.     As the Fiends were leaving Plaintiffs' home, Father Doe realized that he recognized the tall, thin male in the pink hoodie as Student Perpetrator.

100.    After the Fiends left the Plaintiffs' home, they began to piece together that the Fiends' visit was not innocent. They assumed, at a minimum, that Student Perpetrator's late night unexpected and uninvited appearance at Plaintiffs' home was an attempt to scare Student Doe or traumatize Student Doe using Halloween as an excuse to visit as cover for yet another abusive prank. Time would tell that the Fiends' had a far more insidious plan.

101.    Unbeknownst to Plaintiffs at that time, members of the Fiends had visited the home of one of Student Doe's friends and a fellow AFS classmate who resided close to Plaintiffs' home, looking for Student Doe, before arriving at Plaintiffs' home.

102.    Also unbeknownst to Plaintiffs at that time, members of the Fiends had visited the home of a second of Student Doe's friends and a fellow AFS classmate that evening also looking for Student Doe.

103.    On Friday, December 20, 2019 (the last day of the 2019 academic year) -- on AFS' campus -- Student Perpetrator again sought to falsely imprison, assault, bully and harass Student Doe on AFS's campus.

104.    Immediately in response to the December 20, 2019, incident, Father Doe contacted Nourie to inform him that "another significant and unacceptable" incident took place on AFS' campus that very day, stating, in part:

> I am writing to follow up on the issue that [we] met with you about earlier this year regarding the inappropriate behavior of [Student Perpetrator]. Unfortunately, there was … another significant and unacceptable issue that took place today at school. We are of the view that this matter should be escalated.
>
> I would like to address the issue with you at your earliest convenience and discuss how we incorporate the other student's parents into the process. We do not need to speak immediately, but I would like to resolve the issue before the kids return to school.

105.    The following day, Nourie responded that he was "very sorry something inappropriate occurred yesterday for [Student Doe]" and scheduled a call with Mother Doe and Father Doe.

106.    On December 30, 2019, Mother Doe and Father Doe spoke with Nourie by telephone and related Student Perpetrator's conduct, including abuse, harassment and bullying of Student Doe on AFS's campus on December 20, 2019.

107.    During that meeting, Mother Doe and Father Doe related that Student Perpetrator and a group of seven other AFS students who claimed to be "friends of [their] daughter" appeared unexpectedly at their home. They explained that in retrospect it was evident that the Halloween visit was not innocent and should be investigated by AFS as it was apparent that the visit to Plaintiffs' home by approximately eight AFS students was part of a persistent pattern of abuse, bullying and harassment of Student Doe by AFS students.

108.    During the telephone call, Nourie represented that he and the appropriate members of the AFS community would work to address Student Perpetrator's continuing abuse, harassment and bullying, address it immediately upon the students' return to campus and with Student Perpetrator's parents, and work to protect Student Doe.

109.    Nourie confirmed AFS's commitment to addressing the situation and protecting Student Doe from Student Perpetrator, in an email dated December 30, 2019:

> Thank you for taking the time to thoughtfully share [Student Doe's] experiences over the last several months with [Student Perpetrator] and your concerns for [Student Doe] at this moment and going forward. I'm very sorry to hear what [Student Doe] has been going through and the toll that it has taken on [Student Doe]. I am grateful that [Student Doe] has a trusting and supportive relationship with you and a therapist that has been helpful to [Student Doe] as well.
>
> With what you've shared, it is important for the adults at school to be involved at this time. Dom[inique M. Gerard, AFS Upper School Director] is away for the

break, but we did meet by phone this afternoon so that I could share your concerns with him and so that we could develop a plan for next steps. Critical to a thoughtful process will be [Student Doe] talking with Dom[inique Gerard] and LaToya [Miller, AFS, Upper School Dean of Students] on Monday so that they can hear [Student Doe's] experiences from [Student Doe] as the basis of our moving forward. He will reach out to [Student Doe] by email on Saturday to hear if there are any other adults from AFS that [Student Doe] would like to have present as support such as [Student Doe's] advisor Melanie so that he can schedule a meeting when all can be present. If you would like to be there as parents for support, that would welcome as well; you and [Student Doe] will decide what makes most sense for you as a family in terms of being at the meeting. Dom[inique Gerard] and LaToya [Miller] will listen supportively and carefully and may also ask if there are other students they should talk to for further information or more perspective.

That meeting will form the basis of decision making about next steps with [Student Perpetrator] and his family.

Again, I am appreciative of your outreach and for letting us know what [Student Doe] has been experiencing. Your sharing this information over the break allows us to plan for addressing this on the first day back when all the right resources in terms of people are available.

110.    Mother Doe and Father Doe responded to Nourie's December 30, 2019, email that they would like to attend the proposed meeting and that they would like Ryan to be present as well.

111.    On January 4, 2020, Gerard wrote to establish the promised meeting. Gerard expressed a willingness to listen to Student Doe recount the abuse, bullying and harassment to which Student Doe had been subjected <u>on AFS's campus</u> and elsewhere. Gerard encouraged Student Doe to be fulsome and vulnerable when revealing [Student Doe's] trauma and abuse <u>on AFS's campus</u>.

112.    Gerard also pressured Student Doe to keep the fact of Student Perpetrator's abuse <u>on AFS's campus</u> confidential to avoid "social drama," stating, in part:

I've also heard from your parents through Rich [Nourie] that you've been dealing with some hurtful and distressing interactions between you and another student, and LaToya [Miller] and I would like to hear more about it.

I asked Rich [Nourie] to convey to your parents that we're going to take this very seriously, but to do so we need you to be as upfront and honest as possible about

all the interactions you've had. We're also going to need as much detail from you as possible, including the names of any other students who have witnessed these interactions. If you have any evidence of interactions that occurred online, that would also be helpful. (I know it's difficult when a lot of social media interactions happen on Snapchat.) If you want to write things down to help you to remember and bring those notes with you, that is totally fine.

LaToya [Miller] and I would like to speak with you on Monday at 9AM in my office. I believe you're free then. Kevin [Ryan] will also be joining us, and I believe your mother wants to be a part of the conversation as well.

In the meantime, ***I would strongly encourage you to keep this situation and our upcoming conversation confidential. We want as little social drama around this situation as possible, as I'm sure you do too***. The adults copied on here (and Rich [Nourie]) are the only AFS faculty or staff who currently know anything about what you want to share with us. After our conversation, we will most likely share some information with Margaret, your advisor, and Drew, your Grade Dean. But first we want to hear from you.

(Emphasis added.)

113.    On January 5, 2020, Mother Doe and Father Doe wrote to Nourie, Gerard, Miller and Ryan to convey that although "[r]eliving [Student Perpetrator's] continuing abuse is clearly traumatizing, embarrassing and humiliating" Student Doe wanted to meet with AFS without Mother Doe and Father Doe present.

114.    Mother Doe and Father Doe trusted AFS apply the required procedures under the AFS Handbook, conveyed that they respected the feelings of trauma, embarrassment and humiliation caused by Student Perpetrator's conduct including on AFS' campus (and that of the AFS classmates whom Student Perpetrator had recruited to participate), had caused Student Doe to suffer significantly.

115.    Mother Doe and Father Doe conveyed their expectations for AFS' handling of the January 6, 2020 meeting with Student Doe, writing, in part, "[w]e expect that [Student Doe] will be treated with dignity and respect by all in attendance. I trust that all assembled are empathetic to how complex and difficult this experience is for a 15 year old girl."

116.    Mother Doe and Father Doe also requested a meeting with representatives of AFS for a "summary" of their January 6, 2020 meeting with Student Doe and to "discuss [AFS's] initial impressions and to consider the next steps together."

117.    Despite the absence of the support of a parent, friend or loved one, on January 6, 2020, Gerard, Miller and Ryan met with Student Doe who described in detail the physical and emotional abuse Student Perpetrator (and the other AFS students that he recruited to participate) inflicted upon Student Doe on AFS's campus and beyond. Student Doe attempted to provide AFS with a detailed version of Student Perpetrator's abuse (and that of other AFS students) of Student Doe on AFS's campus and beyond. Student Doe answered all of the questions posed by Gerard, Miller and Ryan. During the meeting Miller sat next to Student Doe as Student Doe cried, telling AFS that, among other things, Student Perpetrator had pinned Student Doe down, on AFS's campus, while slapping Student Doe. Miller responded that Student Doe did not deserve to be mistreated by Student Perpetrator and that AFS "should have done more."

118.    Also during the meeting, Student Doe warned Gerard and Miller that they could not take Student Perpetrator at his word because (i) he was adept at deception (he had bragged of frequently successfully lying to his therapist and parents); and (ii) he was very manipulative. Despite those warnings and gravity of the situation, AFS demonstrated little actual regard for Student Doe's physical safety or psychological and emotional wellbeing.

119.    For example, during the meeting Student Doe revealed that Student Doe had then begun to identify as a lesbian. In response, and in violation of Title IX, Miller asked "then why did you date [Student Perpetrator]" -- a male?

120.    On January 6, 2020, shortly after their meeting with Student Doe, Gerard reported to Mother Doe and Father Doe that Gerard, Miller and Ryan "had a very good meeting with

[Student Doe]" and that Student Doe "handled the difficult conversation thoughtfully and courageously."

121.    On January 8, 2020, Mother Doe and Father Doe met with Gerard, Miller and Ryan regarding the January 6, 2020 meeting.

122.    At that meeting, Gerard, Miller and Ryan praised Student Doe for engaging in a candid and very painful discussion regarding the abuse that suffered <u>on AFS's campus</u> at the hands of Student Perpetrator and other AFS students that he recruited. Miller offered that Student Doe cried often during the meeting and that Miller held Student Doe's hand as Student Doe conveyed the abuse that Student Doe suffered <u>on AFS's campus</u>, and elsewhere, in detail.

123.    Gerard, Miller and Ryan revealed facts regarding Student Perpetrator's abuse that were previously unknown to Mother Doe and Father Doe and which had only been disclosed *to AFS* as of that time. For example, Gerard and Miller conveyed that Student Perpetrator had slapped Student Doe <u>on AFS's campus</u>, had physically restrained Student Doe and that other AFS students had participated.

124.    During the January 8 meeting, Mother Doe and Father Doe told Gerard, Miller and Ryan what they knew about the unwelcome visit Student Perpetrator and other AFS students paid to their home in October 2019. All agreed that the visit was unusual and inappropriate, appeared designed to threaten Student Doe and Gerard assured that it would be investigated.

125.    Mother Doe and Father Doe conveyed that because of Student Perpetrator's abuse, Student Doe had developed an eating disorder, began a course of antidepressants, suffered frequent panic attacks, and had significant anxiety about attending school, could no longer ride the Northwester bus to AFS and was suffering considerably.

126.     During the meeting, Miller revealed that Student Perpetrator was currently meeting with AFS officials regarding a separate behavioral issue and implied the Student Perpetrator was likely to be suspended or expelled from AFS. Miller also stated that Student Perpetrator was in a heightened state of awareness and anxiety because he had a sense that "something is going on" and sensed that "the hammer is coming down." Miller's message was clear -- Student Perpetrator's misconduct and disciplinary conduct at AFS were not limited to Student Doe (which AFS knew) and Student Perpetrator knew that repercussions were imminent. Miller suggested that Student Perpetrator was approaching a crisis state.

127.     In response to the representations of Miller and Gerard regarding the exam season impacting the entire AFS Community and Student Perpetrator's psychological state, in the spirit and practice of the Quaker values that AFS purported to possess, practice and uphold, Mother Doe and Father Doe were not only concerned about their child, but also with the well-being of Student Perpetrator and the AFS community. Gerard and Miller explained that the students were about to take their Winter exams and expressed their concern that if the matter regarding Student Perpetrator emerged before exams were completed, it could destabilize Student Perpetrator, impair his ability to perform on his exams and result in widespread "social drama" at exam time. In response to the concerns expressed by Gerard and Miller, it was agreed that the process of disciplining Student Perpetrator would begin immediately after exams and include the direct involvement of his parents.

128.     During the meeting, Mother Doe and Father Doe reiterated that Student Doe was suffering from extreme anxiety because of the events at AFS and the Student Perpetrator and specifically requested Ryan's assistance.

27

129.    Mother Doe and Father Doe also expressly requested that AFS organize the academic schedules of Student Doe and Student Perpetrator to ensure that they not have any classes together and that AFS ensure protection from Student Perpetrator during free periods and lunch – a time of frequent abuse, bullying and harassment of Student Doe on AFS' campus. Also, during the meeting, Mother Doe asked if there was any misconduct by Student Doe and if AFS was aware of any facts that contradicted Student Doe's version of events. Gerard and Miller stated that they were not aware of any misconduct by Student Doe and that they did not dispute of Student Doe's version of events, but stressed that Plaintiffs should not disclose the facts to anyone pending AFS's "investigation."

130.    In an email to AFS, Mother Doe and Father Doe followed up the January 8 meeting in which they conveyed their understanding so that all involved were "clear on next steps," stating, in part, as follows:

> Of the three options we discussed, are we agreed that you will be meeting with Rich [Nourie] to plan a meeting with [Student Perpetrator's] parents, and then include [Student Perpetrator] in the discussion?  You will formulate a plan that includes:
>
> 1- [Student Perpetrator] and his parents will understand the examples of [Student Perpetrator's] physical and emotional abuse of [Student Doe] during their relationship and that his emotional abuse of [Student Doe] continues.
>
> 2- [Student Perpetrator] and his parents understand that [Student Perpetrator] recruited a group of AFS boys to harass [Student Doe] at AFS during and after their relationship.
>
> 3- [Student Perpetrator] and his parents understand that his Halloween visit to our house with his friends was threatening and unacceptable. He should also understand that he is not welcome to visit our home. (If the latter is beyond the purview of the school's role, we will address it directly with [Student Perpetrator's] parents.)
>
> ***
>
> 5- [Student Perpetrator] and his parents understand that [Student Perpetrator] is not to speak to or come near [Student Doe], or any member of our family. Additionally,

28

[Student Perpetrator] is not to come to our home under any circumstances.

6- [Student Perpetrator] will take responsibility for his behavior, the long term effects that his behavior has had on [Student Doe] and our family.

7- A plan is put into place to get [Student Perpetrator] and his family the help that they need.

8- A plan is put into place to ensure that [Student Doe] is safe from [Student Perpetrator] at school, outside of school and on social media.

9- AFS develops a plan for the AFS community to understand physical and emotional abuse in dating relationships, and steps for reporting and care for community members.

10- AFS develops a plan for AFS community members to understand the roll of friend groups and community members in emotional abuse and intimidation.

11- AFS develops a plan to support a safe and emotionally healthy and supportive male community.

12- AFS/Kevin work with [Student Doe] and our family for emotional support while going through this time. [Student Doe] will continue in therapy.

If there are other areas that our family needs to address, please bring them to our attention.

We appreciate that this is a big task that will require immediate, short term and long term planning. ***We look forward to listening, and proceeding with compassion to create a positive, productive and safe outcome for [Student Doe] and [Student Perpetrator] and the AFS community.***

(Emphasis added.)

131.    During this time, Mother Doe provided AFS with numerous resources regarding the impact of bullying, harassment, and abusive relationships on teenage girls and the type of anxiety from which Student Doe was suffering, as had been reported to AFS.

132.    On January 13, 2020, Gerard again pressed Student Doe to keep the fact of the abuse, harassment and bulling on AFS's campus "confidential."

133.    Gerard also reported in an email that AFS' investigation had consisted of speaking with one of the students identified by Student Doe and that that student had provided support for Student Doe's version of events, stating, in part, that the student "was able to give us greater context and support for [Student Doe]'s story." Gerard continued to stress confidentiality:

> As you had suggested, we are going to wait until next Friday - after exams are concluded - to meet with [Student Perpetrator's] parents. We will share the information with them so that they can process over the weekend and then meet together with them and [Student Perpetrator] the following Monday. We are in agreement with a path forward, but obviously, a lot will depend on how the [Student Perpetrator]s process the information and how [Student Perpetrator] deals with it as well.
>
> You are welcome to let [Student Doe] know the timeline, but obviously, ***encourage [Student Doe] to keep everything very confidential***.

(Emphasis added.)

134.    On January 14, 2020, Father Doe conveyed to AFS that this process "has been very hard on [Student Doe]" as Student Doe was continuing to suffer in numerous ways that were manifesting as anxiety, sleeplessness, panic attacks, exacerbated eating disorder, in ability to focus on school work, among others.

135.    In the Quaker tradition that AFS purports to represent, Mother Doe and Father Doe continued to be thoughtful and considerate of Student Perpetrator and his family, notwithstanding his inexcusable abuse, harassment and bullying of Student Doe on AFS's campus and beyond, stating – in the language of Quakers "[w]e appreciate that the [Student Perpetrator and his family] will have their own experience with this information, and are holding [Student Perpetrator], and his family in the light" but reiterated that it the experience had been difficult as it had been causing Student Doe to suffer extreme anxiety. Mother Doe and Father Doe also asked Ryan, Nourie,

Gerard and Miller if "there is anything we should do, or not do, going forward." No one from AFS responded to this request for guidance and support.

136.    For the first time since January 13, 2020, AFS contacted **Mother Doe and Father Doe** on January 24, 2020, to reveal that they still had not met with Student Perpetrator or his family. Gerard stated that AFS had to:

> postpone talking to [Student Perpetrator's] parents until Monday [January 27, 2020]. We will be contacting them via email tomorrow and asking them to meet to discuss "interactions he has had with a female student with whom he had a relationship last year." We will also be asking them to keep this conversation between the adults and to not ask [Student Perpetrator] what's going on. I hope they will be able to do that; however, if they ask him about why they are being asked to meet with me and LaToya [Miller], it could cause a reaction from [Student Perpetrator].

137.    On January 24, 2020, **Mother Doe and Father Doe** asked Gerard for clarification about how AFS planned to characterize the situation to Student Perpetrator's parents for purposes of scheduling the meeting with Student Perpetrator's family. Neither Gerard nor anyone else from AFS responded.

138.    AFS did not meet with Student Perpetrator's parents on Monday, January 27, 2020, as they represented that they would.

### Ten-Sem: AFS Compounds the Trauma Suffered by Student Doe at AFS

139.    At the same time that AFS had convinced Student Doe to fully relate Student Doe's abuse by Student Perpetrator and several other AFS students on AFS's campus, AFS callously betrayed Student Doe's trust.

140.    On January 28, 2020, -- just 4 days after Plaintiffs' email to Gerard to which no response was given -- AFS Sophomores began a specialized class known as Ten-Sem. Ten-Sem runs for a short period of the year following the student's return from Winter Break.

141.     As Upper School Dean of Students, Miller has a substantial role and ultimate responsibility for selecting and setting students' academic schedules at AFS, including that of Student Doe and Student Perpetrator, during the 2019-2020 academic year. During the 2019-2020 academic year, Miller also taught at least one course at AFS sometimes referred to as a Ten-Sem.

142.     Further to Nourie's assurances on September 10, 2019; Miller and Gerard separately assured Plaintiffs – on January 6 and January 10 -- that they would ensure that Student Doe and Student Perpetrator did not have the opportunity to interact, necessary AFS faculty and administrators would be alerted to the need to protect Student Doe from Student Perpetrator and that they would not be placed together in classes or otherwise at AFS.

143.     As of that time, on four separate occasions, including on January 8, 2020, Student Doe had asked AFS, including Gerard, Miller and Ryan, not to place Student Doe in a class with Student Perpetrator.

144.     Likewise, Mother Doe and Father Doe had requested that AFS not place Student Doe in a class with Student Perpetrator, including on January 8, 2020.

145.     On January 8, 2020, Gerard and Miller assured Mother Doe and Father Doe that AFS would not place Student Doe in a class with Student Perpetrator.

146.     On January 28, 2020, Student Doe reported to the Level 1, Ten-Sem to which Student Doe had been assigned by Miller and for whom Gerard is responsible as Head of the Upper School.

147.     Upon arrival at the assigned Ten-Sem class, which Miller was teaching -- Student Doe hesitated and did not enter. Miller ordered Student Doe to enter the classroom and to "just take a seat." Student Doe, stunned, declined and indicated a need to go to the restroom and left the classroom.

148.    Student Doe refused because AFS had failed Student Doe and broken its promises to protect Student Doe from Student Perpetrator. AFS and Gerard, Miller, Nourie and Ryan – the adults charged with and who pledged to protect Student Doe – failed to protect Student Doe. They put Student Doe directly in harm's way. Already seated in the Ten-Sem for which Miller -- had created the class list and which Miller was teaching -- was Student Perpetrator.

149.    And still, AFS had not spoken with Student Perpetrator or his parents.

150.    Unexpectedly seeing Student Perpetrator in Miller's class caused Student Doe to suffer a panic attack. Refusing Miller's demands that Student Doe "just sit down" Student Doe retreated to the ladies' room, the only somewhat safe place that Student Doe knew on the AFS campus. Hysterical at AFS's betrayal and perpetuation of the trauma caused by Student Perpetrator on AFS's campus, Student Doe called Mother Doe to inform her of AFS's inexcusable failure and that AFS had placed Student Doe in harm's way.

151.    At Mother Doe' urging, Student Doe eventually went to see Ryan, but told him that Student Doe was not ready to speak with him about the incident, and asked Mother Doe to take Student Doe home because Student Doe was having a panic attack.

152.    Sequestered in Ryan's office while experiencing a panic attack and extreme anxiety, Student Doe waited with Ryan. Also present was one of the AFS Class Clerks to whom Student Doe had reported the May 2019 incident. While there, Student Doe reiterated to Ryan that Student Doe was not ready to speak with Gerard and Miller regarding the incident.

153.    Against Student Doe's express request and need due to Student Doe's anxiety and panic attack, Gerard and Miller nevertheless entered Ryan's office and insisted that Student Doe speak with them – without parents or another guardian present -- regarding *AFS'* failure to protect Student Doe, failure to honor Plaintiffs' request that Student Doe not be placed in a class with

Student Perpetrator while AFS was still purporting to try to meet with Student Perpetrator's parent, and *AFS'* broken promises to work to ensure Student Doe's safety and wellbeing.

154.    Student Doe stated that due to a panic attack Student Doe could not have the discussion and left to wait in the ladies' room. Student Doe then telephoned Mother Doe and was extremely distraught.

155.    With Student Doe sequestered in AFS's the bathroom, Student Doe contacted AFS to say that Student Doe was "extremely upset and feels betrayed."

156.    Upon Mother Doe's arrival, Gerard and Ryan met Mother Doe in AFS's lobby with Student Doe still sequestered in the ladies' room.

157.    Gerard and Ryan wanted to speak with Mother Doe who asked that they speak in Gerard's office. Mother Doe explained how traumatized Student Doe was, and how flabbergasted she was at AFS's failure to protect Student Doe, AFS's failure to honor their promise to not put Student Doe and Student Perpetrator in a class together and that they had compounded the trauma caused by Student Perpetrator on AFS's campus. Gerard and Miller acknowledged to Mother Doe that they had failed Plaintiffs. Mother Doe stated that she was extremely disappointed and wanted to take care of Student Doe, gather the facts and regain composure before discussing the matter further. Mother Doe then collected Student Doe and went home.

158.    Meanwhile, all along, students were walking around AFS's Upper School lobby.

159.    News spread quickly that Student Doe was extremely distraught, was not in class, had been hiding in the bathroom, was sequestered in Ryan's office with Gerard and Miller, and that Student Doe's mother had taken Student Doe home in the morning after meeting with Gerard and Ryan.

160.    Almost immediately, Student Doe was being contacted by AFS students asking why Student Doe abruptly left school and why Mother Doe had been speaking with Gerard and Ryan. The AFS Community was abuzz at these events because only months before parents had abruptly arrived to speak with Gerard and whisked their children home midday -- because those students were being disciplined for using marijuana in the Upper School of AFS's campus.

161.    At the time, Student Doe was exquisitely sensitive to the perception of being on the receiving end of discipline or the perception of having been suspended or expelled for engaging in drug use or other serious misconduct and told Ryan AFS as much while in his office that day. Yet, AFS did nothing either preemptively or in response to address Student Doe's abrupt and unexplained departure from campus as a result of AFS's failure.

162.    Overcome with anxiety and forced by AFS to relive Student Doe's trauma and then carelessly betrayed by AFS only to then have the AFS student body assume that Student Doe was somehow in trouble for drug use, Student Doe posted to social media that the persons charged with protecting Student Doe had failed.

163.    Student Doe remained away from school for several days, wracked with anxiety and fearful that returning to AFS would result in more trauma, abuse, bullying or harassment by Student Perpetrator or other AFS students, now compounded by AFS who had promised to protect Student Doe.

   **a.  Miller Admits AFS's Failure and Student Doe Reiterates Student Doe's Legitimate Fear that the Student Perpetrator Would Attempt to Harm Student Doe at Student Doe's Own Home**

164.    For the second time, this time in writing, Miller candidly acknowledged that Miller and AFS were at fault and that their callous disregard for Student Doe and dereliction of their promises to Plaintiffs – who waited patiently for a resolution out of respect for Student

Perpetrator's emotion wellbeing – caused Student Doe to suffer emotionally, writing to Student

Doe:

From: **LaToya Miller** <lmiller@abingtonfriends.net>
Date: Tuesday, January 28, 2020
Subject: An Apology for Today
To ███████████████████████████ >

Good Morning ██ ,

I tried to stop by to speak with you, but Dom said that you needed some time to process and reflect. I respect that. I can't apologize enough for the mistake that happened today. The truth is that I co-teach the class with Mikael and I didn't look at my roster until I read attendance in class. When you came in, I only noticed that ███ was in the corner and that there weren't enough seats. It wasn't until after you left that I noticed that ███████ was there. I knew immediately what was wrong. After a few minutes, I looked for you in Kevin's office before going back to class.

I know that I must be the last person that you want to hear from right now, but I want to acknowledge that I messed up in a big way today. You were put into a compromising position, left unprotected, and that was something that could have been avoided if I had properly planned. You're suffering emotionally now and I know I can't fix it, but I want to express how sorry I am.

Take good care and I hope that I'll see you tomorrow.

LaToya

--
LaToya Miller
Upper School Dean of Students
Abington Friends School

165.    Despite AFS's astonishing failure, Student Doe immediately embraced the Quaker

values *espoused by AFS* – and forgave Miller, acknowledging that Student Doe too makes

mistakes. However, Student Doe did convey their continuing fear of Student Perpetrator:

From: ███████████████████████████ t>
Date: Tuesday, January 28, 2020
Subject: An Apology for Today
To: LaToya Miller <lmiller@abingtonfriends.net>

Dear LaToya

i appreciate your email, thank you for apologizing. i knew from talking to u during that meeting that it must have been

a careless mistake and not a moral wrong doing. i knew that, it would never be intentional and i believe in assuming good intent, which exercised today. i did not mean to reject speaking to u today i knew that in that moment i could not express my thoughts and feelings about the situation in the way i want to. I cannot count the amount of times i have made careless mistakes so it would be unjust and irrational for me to expect you or anyone else to never make a mistake. That being said, after the meeting and even when initially my parents spoke to the school before the year started i assumed that the scheduling department was aware. therefore, i did not emotionally prepare to see him in that class, so i was vulnerable and shocked. I am now aware that the school and ▆▆▆▆ are aware i posted addressing the situation, i understand that it could have been better to let the school handle him finding out that i went to the school, but with recent events most people assumed when they saw me talking to kevin and leaving early that i had gotten in trouble for drugs, which as you know could not be further from the truth and i wanted to shut down those rumors as fast as possible. i did not post anything that wasn't 100% true, that being said now more than ever i am very very afraid of ▆▆▆ trying to hurt me he knows where i live and such i'm handing this to the best of my ability, but in all honestly i am overwhelmed and terrified.

▆▆

166.     Shortly thereafter, at 12:10 pm, Student Doe reiterated Student Doe's concerns to Miller that Student Perpetrator was capable of inflicting harm on Student Doe:

▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆                                              Tue, Jan 28, 2020 at 12:10 PM
To: LaToya Miller <lmiller@abingtonfriends.net>,
▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆

in addition to my previous email i fear that he will try to hurt or make contact with my close friends. I would please like urge the administration to keep an eye on ▆▆▆▆▆▆▆ and ▆▆▆▆.

167.     As of that time, AFS (but not Student Doe) had actual knowledge that Student Perpetrator and a group of AFS students showed up at Plaintiffs' home uninvited on Halloween night, that Student Perpetrator had repeatedly slapped Student Doe on AFS's campus, that Student Perpetrator had physically restrained Student Doe on AFS's campus, that Student Doe was afraid for Student Doe's own safety and that of other AFS students, that Student Perpetrator and a group of AFS students had engaged in a persistent course of physical, emotional and psychological abuse of Student Doe on AFS' campus *and* witnessed firsthand the impact of Student Perpetrator's abuse. Despite this knowledge, AFS did not warn the AFS Community. Nor did AFS remove Student Perpetrator from AFS' campus, discipline Student Perpetrator as required by the AFS Handbook to protect Student Doe or other AFS students or the larger AFS Community.

**AFS Continues to Demand Secrecy, Disregards the Wellbeing of Student Doe and the AFS Community, and Continues to Blame the Victim.**

168.    Despite Miller's admission that AFS had "messed up in a big way…put [Student Doe] into a compromising position, left unprotected, and that was something that could have been avoided if [Miller] had properly planned" and acknowledging that, as a result, Student Doe was "suffering emotionally" – AFS, through Gerard, was singularly focused on suppressing the truth about the abuse, bullying and harassment <u>on AFS's campus</u> and by its students.

169.    To help ensure Student Doe was protected considering AFS's January 28, 2020 failure, Student Doe immediately requested a prompt commitment from Gerard to the following proposed steps:

   a.    Identify all classes, free periods or other times (including lunch, etc.) that AFS has scheduled [Student Doe] and [Student Perpetrator] to be in the same space (i.e., same class, room, free at the same time).

   b.    Reassign [Student Perpetrator] such that he is not in the same class, period, free, etc., as [Student Doe]. To be clear, unless there is some compelling reason (about which we are informed and agree), [Student Doe] should not be reassigned. Student Doe is not the perpetrator and should not be disrupted, singled out, etc., because of [Student Perpetrator'] inappropriate behavior and AFS' failure to manage the situation accordingly.

   c.    If a free or lunch cannot be reassigned, [Student Perpetrator] will be required to stay in a separate space and be supervised to eliminate the possibility of contact between he and [Student Doe].

   d.    Meet with [Mother Doe and Father Doe] tomorrow morning, as early as possible after drop off, to discuss the where AFS is with [Student Perpetrator's] family and next steps.

170.    Mother Doe and Father Doe also reiterated that it was important for Student Doe to try to return to school the following day, but to do so asked for "assur[ance] that AFS is making appropriate efforts to provide a safe environment for [Student Doe] to do so."

171.     AFS demurred. AFS, through Gerard, trivialized AFS's failure and shifted to underline blaming the victim, while ignoring Plaintiffs request that AFS' cooperate to protect the victim going forward. Gerard responded: "Thank you for your thoughts, and I can only express again how sorry I am for the mistake in scheduling" and that he could meet in the morning. Then, Gerard then returned to the concern that he had been projecting all along – suppression of the truth – and blamed Student Doe:

> I'm not sure if you are aware, but [Student Doe] posted on social media regarding the situation. Though we are talking with [Student Perpetrator] and his family and he has been clearly instructed not to reach out to [Student Doe], the situation has been ***exacerbated***. (Emphasis added.)

172.     Gerard ***did not***: ask how Student Doe was handling the incident that AFS caused; what AFS could do to help; if Student Doe would be returning to school the next day; what AFS could do to protect Student Doe; address any of the action steps Plaintiffs requested; or implement the procedures dictated by the AFS Handbook.

**Nourie's Empty Promises and Failure to Ensure Promised Follow-Up**

173.     On the morning of January 28, 2020, Mother Doe wrote to Nourie to inform him of AFS' callous disregard for Student Doe's wellbeing by Gerard and Miller and AFS's failure to provide the most basis protection it has promised – separating Student Perpetrator -- and asked the Nourie contact Mother Doe.

174.     In contrast to Gerard's focus on blaming the victim, Nourie acknowledged that the situation involving Student Perpetrator was "serious" and that Plaintiffs had been exceptional partners with AFS and were sensitive to the needs of an emotionally troubled Student Perpetrator despite his inexcusable assault, bullying and harassment, stating:

> I do want to acknowledge that we have felt very engaged with you in listening to [Student Doe], supporting [Student Doe] and in together creating a thoughtful,

39

intentional approach to addressing ***issues that we all consider to be serious***. We have sought additional information, worked on a timeline of addressing the other family that was sensitive to the needs of [Student Doe] and the other student with the exam period that just ended and have given extensive thought to our approach with the family going forward. ***You and [Student Doe] have been exceptional partners in this work, thoughtful and thorough in your thinking with us. We have tremendous respect for how you have brought these concerns forward, how you have supported [Student Doe] and how you have collaborated with us on the plan that we are engaged in.*** And I know that Kevin, LaToya and Dom have been earnestly seeking to support [Student Doe] as well as possible through this process.

And so ***we are deeply regretful for this morning's oversight. It should not have happened*** and I feel badly not only for [Student Doe]'s experience but for undermining your trust in us. I hope that we can re-establish that sense of partnership in order to best support [Student Doe] now and going forward.

(Emphasis added.)

175.    Nourie continued to indicate that AFS intended to fulfill its obligations to address the abuse, harassment and bullying, stating that he "look[ed] forward to your reconnection with us in our plan for addressing the issues at hand" and promised that Gerard would "be in touch about the specific requests you have shared with us." Accordingly, Plaintiffs believed and understood that AFS was still working on implementing a "plan" to apply the process required by the AFS Handbook.

176.    Despite Nourie's promise -- Gerard was never in touch about the requests that Plaintiffs shared with AFS, nor was any other representative of AFS.

### The Parties' January 29, 2020 Meeting

177.    On January 29, 2020, Mother Doe and Father Doe met with Nourie, Gerard, Miller and Ryan. Among other things, they reiterated that Student Doe's experience with Student Perpetrator at AFS and beyond had been extremely detrimental to Student Doe's wellbeing and that Student Doe was suffering from extreme anxiety, providing details

regarding the substantial deleterious effects on Student Doe's appearance, physical health, emotional health, anxiety levels and over all wellbeing.

178.    During the meeting Nourie and Miller again apologized for AFS's failure on January 28th.

179.    During the meeting, Nourie revealed that AFS still had not engaged the Student Perpetrator's family regarding Student Perpetrator's persistent abuse, harassment and bullying of Student Doe, including on AFS's campus. Critically, according to Nourie, the Student Perpetrator's family only learned of the Student Perpetrator's repeated Major Violations of AFS's Community Standards as a result of Student Perpetrator's response to Student Doe's January 28, 2020 post – not from AFS.

180.    For the first time, AFS was forced to deal with fact that the pervasive abuse, harassment, and bullying on AFS's campus, constituting Major Violations of AFS's Community Standards, by Student Perpetrator and numerous other AFS students, was now becoming public. AFS was no longer in control of the narrative, In response, AFS sought to change the narrative by blaming the victim.

181.    According to Nourie, because of AFS's mishandling of the situation, the Student Perpetrator's family was "blindsided" and "very angry" with AFS.

182.    Nourie explained that AFS was now dealing with the "fallout" of a "very angry" Student Perpetrator family and that it was seeking to do "damage control." Nourie also confirmed that Student Perpetrator was not in school that day and agreed to alert Plaintiffs when Student Perpetrator was expected to return.

183.     Meanwhile, Gerard remained focused on Student Doe's social media posting regarding AFS's failure, reiterating that the January 29, 2020, social media posting had "complicated" the situation and AFS' response.

184.     By January 29, 2020, Student Doe's physical and mental health had continued to deteriorate significantly. Mother Doe provided AFS with photographs of Student Doe that plainly depicted a rapid and significant decline, which Miller acknowledged.

### The Parties' February 12, 2020 Meeting

185.     AFS did not follow-up again until February 10, and only then to schedule a meeting for February 12, 2020. AFS explained only that they wanted to "share the process and conversations that have been underway since we last met and where we are in addressing the issues."

186.     On February 12, 2020, Mother Doe and Father Doe again met with Nourie, Gerard, Miller and Ryan.

187.     Nourie began the meeting by explaining that Student Perpetrator's family was angry with AFS because of the "break down of the process." Nourie also related that, according to the Student Perpetrator family, because of the public disclosure of his Major Violations of AFS's Community Standards, Student Perpetrator was experiencing anxiety and had missed four days of school. Nourie also acknowledged that he had not read any of the resources provided by Mother Doe, including those regarding the impact of bullying, harassment, and abusive relationship on teenage girls and the type of anxiety from which Student Doe was suffering, as had been reported to AFS.

188.     Nourie then explained that the conduct was "in the past." Nourie has written that "we cannot deny someone the context in which their narrative exists" but on February 12, 2020, Nourie sought to deny that the truth of Student Doe's narrative has consequences for the person who is abused and the AFS community at large.

189.     In response to Father Doe's question, Gerard related that Student Perpetrator had been asked about his unauthorized visit, along with approximately seven other AFS students, to Plaintiffs' home. Girard therefore concluded that Student Perpetrator said that he was "just in the neighborhood" and that Gerard determined that Student Perpetrator had no ill intent and Plaintiffs' concerns were unfounded. However, when asked, Gerard acknowledged – despite an explicit warning by Plaintiffs that Student Perpetrator was adept at deception and Plaintiffs' request – that AFS failed to investigate the conduct of any of the other AFS students who appeared at Plaintiffs' home as it failed to speak with them.

190.     Gerard and AFS also acknowledged that Student Perpetrator had slapped Student Doe on the face on AFS's campus, i.e., committed battery. However, Gerard stated that Student Perpetrator's unlawful application of force directly upon Student Doe, causing bodily injury, offensive contact and mental anguish was not actually a battery, act of violence or Major Violation of AFS's Community Standards because Student Perpetrator – – *only* slapped Student Doe in the face with slices pieces of cheese on AFS' campus. Gerard dismissed that Student Perpetrator's battery was not consensual, that Student Perpetrator used physical restraint and encouraged other AFS students to video record his conduct and disregarded the other forms of battery reported to AFS.

191.     Nourie acknowledged that Plaintiffs' allegations "weren't in dispute," but that they "happened last year." Father Doe responded that Student Doe had reported the May

43

24, 2019 incident to AFS's Class Clerks on May 24, 2019, that Plaintiffs had made repeated reports and that the parties were in regular contact regarding Student Perpetrator's conduct and that AFS's obligation to act was not limited by time. Father Doe requested that AFS reconsider and Nourie agreed that AFS would take Plaintiffs' request "under consideration."

192.    Plaintiffs asked what the consequences would be for Student Perpetrator. Nourie responded that Student Perpetrator had missed four days of school due to the stress of dealing with the revelation of his sustained abuse, harassment and bullying. AFS did not indicate that AFS would fail to implement the procedures that it was required to implement pursuant to the AFS Handbook. Thereafter, Plaintiffs expected that AFS would implement the procedures that it was required to implement pursuant to the AFS Handbook.

**AFS Continues to Blame the Victim and Fails to Investigate or Address the Continuing Harassment of Student Doe**

193.    On April 20, 2020, Gerard wrote to Mother Doe and Father Doe regarding Student Perpetrator, stating that "this has been an emotionally very challenging relationship for [Student Doe]" and that he "can understand how for [Student Doe] this *may feel like using [Student Doe's] voice* to address the issues." (Emphasis added.) That is -- the voice AFS had been worked to silence.

194.    Gerard attached three social media posts to his email. He stated that although Student Doe may feel like Student Doe was using Student Doe's voice, "[Student Doe] has done that now repeatedly and *to continue to do so would be harassment and must stop*." (Emphasis added.) That is, AFS took the position that a victim telling the truth about abuse, bullying and harassment – Major Violations of AFS's Community Standards -- somehow constitutes "harassment."

195.    Gerard represented that Student Perpetrator "doesn't follow [Student Doe] on any social media." Student Doe had long since ago blocked Student Perpetrator on all social media. Therefore, any knowledge that Student Perpetrator may have of a social media post by Student Doe was provided a third party.

196.    After thoughtful investigation and analysis, Father Doe responded to Gerard with his concerns that, read in context, in part, <u>the social media postings evidenced continuing harassment of Student Doe</u>, not harassment by Student Doe. The three social media posts Gerard attached are included, as follows.

197.    As for the first posting, according to Gerard, "a friend forwarded [Student Perpetrator] a post that Student Doe made on some type of new storytelling platform where the post only lasts for 24 hours." The post did not identify Student Perpetrator. According to Gerard, the content apparently led Student Perpetrator to believe that the post was about him. The post stated, in full:



198.   Gerard's email does not question the ***truth*** of Student Doe's private post –

which does not name Student Perpetrator.

199.   The second private posting was from TikTok and, likewise, did not name

Student Perpetrator:



ii.   The third social media post from Instagram, unlike those above, was *public*

("Instagram screenshot"):



200.    A plain reading of the Instagram screenshot makes clear that the initial message was sent by an AFS classmate, "Student Z", a friend of Student Perpetrator whom Student Perpetrator recruited to participate in the May 24, 2019 assault, harassment and bullying, Major Violations of AFS's Community Standards.

201.    AFS failed to investigate the genesis of the Instagram post, despite its requirement to do so pursuant to the AFS Handbook and ignored, disregarded, or willfully failed to address why the post was a form of harassment of Student Doe by Student Z and, potentially, by Student Perpetrator by proxy which was "liked" by at least 47 other people by the time Gerard sent it to Plaintiffs – meaning that at least 47 people had "liked" the harassment and bullying of Student Doe – a fact to which AFS was indifferent.

202.    Student Z's tagging of Student Perpetrator and Student Doe in the Instagram screenshot was in response to a question along the lines of "Name two people who should be in a relationship but are too embarrassed to say." Specifically, the post begins: "[Student Z] @[Student Perpetrator] @[Student Doe]." This means that Student Z tagged Student Perpetrator and Student Doe in response to the question. Had AFS investigated, it would have determined that the pattern of harassment of Student Doe was continuing and included harassment of Student Doe based on sexual orientation.

203.    AFS' failure to investigate is consistent with Gerard's lack of basic inquiry is consistent with his lack of minimal inquiry regarding the Fiends' appearance at Plaintiffs' home to physically attack Student Doe. Further, AFS exacerbated Student Doe's trauma and anxiety by making false accusations.

204.    Read in context, Student Doe's response to Student Z' post – "that's not f***ing funny" is in self-defense against further and continuing harassment and bullying,

including as to Student Doe's sexual orientation. Student Z's posting was particularly insidious because it targeted Student Doe on the basis of sexual orientation. As discussed above, during the January 10, 2020, meeting with AFS, including Gerard, Student Doe disclosed that Student Doe identified as a lesbian. The Instagram post contended that Student Doe should be in a heterosexual relationship with a male that abused, bullied and harassed Student Doe. AFS failed to address the harassment of Student Doe on the basis of Student Doe's sexual orientation, mischaracterizing the post as abuse *by* Student Doe plainly indicating that AFS believed that the Instagram post was within its purview to enforce pursuant to the AFS Handbook.

205.   Father Doe explained as much to Gerard and requested that AFS take action – which it did not, stating:

> First, we were deeply disturbed by the second post that you provided. (*See* Instragrm screenshot, at 12:28 am). Based on our investigation, we understand that the issue began with an Instagram question (that was ***not*** posted by [Student Doe]), along the lines of "Name two people who should be in a relationship but are too embarrassed to say." In response, [Student Z] (an AFS Upper School classmate of [Student Doe] and [Student Perpetrator]) ("Instagram Poster") posted publicly by identifying [Student Doe] and [Student Perpetrator] as an answer. [Student Doe] responded to [Instagram Poster] "that's not fucking funny" and added "imagine making a joke about me and my abuser and thinking you are funny." (*See* Instragrm screenshot, at 12:28 am).

> We have several thoughts about the reactions to [Instagram Poster's] post. For present purposes, our interpretation is that [Instagram Poster's] post ***may constitute harassment of [Student Doe] pursuant to AFS' Policy***. (Emphasis added). [Student Doe] immediately felt stigmatized and victimized by [Instagram Poster's] posting. Your email and the post that you provided helped us to piece together events in our own home. Not long after [Instagram Poster's] post, [we] were awakened by [Student Doe's]sobbing…. We both went to speak to [Student Doe who] became increasingly upset and cried uncontrollably, but would not give us detail regarding what was upsetting [Student Doe] except to say that it had something to do with [Student Perpetrator] and that [Student Doe] did not want to discuss it further. We did not raise the issue with AFS at the time because we did not have sufficient information to present based on [Student Doe's] reluctance to speak-up. However, based on the information that you provided and our subsequent discussions with [Student Doe], we now understand that [Instagram Poster's]

public posting mocking the idea that [Student Doe] and [Student Perpetrator] should be in a relationship and that [Student Doe] is too embarrassed to say so publicly (when, as you know, [Student Doe] asserts that [Student Perpetrator] abused [Student Doe] and that [Student Doe] has come out publicly as a lesbian, thereby making light of physical, sexual and emotional abuse and [Student Doe] sexual orientation), which was profoundly destabilizing and continues to be so.

Based on our reading of your recitation of the events and our own investigation, the only public posting made by [Student Doe] that may have been directly accessible by [Student Perpetrator] was the Instagram post that began with [Instagram Poster] and ended with [Student Doe] telling [Instagram Poster] that his post was not funny, effectively asking him to stop posing jokes about [Student Doe] that were causing [Student Doe] to feel victimized and stigmatized. We understand that [Student Perpetrator] was able to view the Instagram posts because [Instagram Poster] made them publicly and in a forum that was directly accessible to [Student Perpetrator]. Please let us know what steps AFS has taken with respect to [Instagram Poster's] conduct. If AFS has not yet acted with respect to [Instagram Poster's], please let us know what steps AFS plans to take to address [Instagram Poster's] public social media post that mocked [Student Doe] for [Student Doe's] status as an abused person and for [Student Doe's] sexual orientation.

Second, having to relive [Instagram Poster's] post and hear about [Student Perpetrator's] reaction to statements that he believes (without attribution to [Student Perpetrator]) describe [Student Perpetrator's] abuse of [Student Doe] and his threats of sexual violence toward our 10 year old daughter, regarding the first and third post attached to your email (which, as you know, were not accessible to [Student Perpetrator] because [Student Perpetrator] has long since blocked [Student Perpetrator] from all [Student Doe's] social media and [Student Perpetrator], as you state, does not follow [Student Doe] on social media) because other students (which was not prompted by [Student Doe]) chose to send [Student Doe's] posts to [Student Perpetrator], further compounded the profoundly negative impact that this matter continues to have on [Student Doe].

206.   Considering Gerard's serious and unfounded accusations and threat of action against Student Doe, Mother Doe and Father Doe also sought clarification from Gerard, as follows:

From our perspective, the immediate issue that requires careful attention is your statement that: "But [Student Doe] has done that now repeatedly and to continue to do so would be harassment and must stop." AFS' view that future posts by [Student Doe], like those attached to your email, may constitute "harassment" is serious and *requires that we share a clear mutual understanding of what constitutes "harassment" so that we may all guide our conduct accordingly*.

207.     In response to these social media posts and Gerard's allegations, Mother Doe and Father Doe requested that AFS let them know which AFS student(s) surreptitiously recorded the posts from Student Doe's private social media and sent them to Student Perpetrator. Father Doe explained that the family wanted to take additional steps, as necessary, to protect Student Doe. They explained further that by surreptitiously collecting Student Doe private media and then sending it to Student Perpetrator "may constitute harassment pursuant to AFS' Policy" and that they wanted to "evaluate whether to require Student Doe to block the person(s) from Student Doe's social media if we determine that the student's motivation may be to attempt to cause harm to [Student Doe] or [Student Perpetrator]."

208.     Neither Gerard nor any other representative of AFS *ever* responded to – or even acknowledged -- Plaintiffs' email.

209.     No one from AFS expressed concern for or inquired about the harm that the Instagram post had and was continuing to cause Student Doe.

210.     Upon information and belief, Plaintiffs' concerns were not investigated and AFS took no action relating to the Instagram Post.

**Student Doe's Fear that Student Perpetrator Would Physically Attack Student Doe – As Communicated to AFS and Miller -- Were Well Founded**

211.     As set forth above, Mother Doe and Father Doe reported the Halloween 2019 action of approximately eight AFS students to Nourie, Miller and Ryan.

212.     Despite being warned by Plaintiffs that Student Perpetrator was adept at misleading adults, Gerard only questioned Student Perpetrator regarding the Halloween

incident. On February 12, 2020, Gerard acknowledged that he did not speak to any of the Fiends who participated in the Halloween incident -- all AFS sophomores.

213.    On July 10, 2020, one of the "Fiends" who appeared at Plaintiffs' home, unsolicited, contacted Student Doe to reveal the truth that Gerard and AFS had failed to discover regarding Student Perpetrator's Halloween visit to Plaintiffs' home because of AFS' failure to investigate by, among other things, failing to speak with the seven other "Fiends" who presented at Plaintiffs' home or to corroborate Student Perpetrator's false claims that the visit was innocent.

214.    Screenshots provided by a "Fiend" who appeared at Plaintiffs' home on the evening and who contacted Student Doe unsolicited, reveal that Student Perpetrator intended to "beat that bitch ass" and tell the story, as follows:

215.    The Fiends obtained the following picture of Student Doe from Student Doe's social media in which Student Doe is riding a skateboard on AFS's campus on October 31, 2019:



216.    One or more AFS students was monitoring Student Doe's social media postings and determined that Student Doe use of a skateboard was cause to "flame" and "roast" Student Doe:



217.    According to the Urban Dictionary, to "flame" or "flaming" is the online act of posting insults, often laced with profanity or other offensive language on social networking sites (https://en.wikipedia.org/wiki/Flaming_(Internet)) or "[t]o engage in an online argument usually involving unfounded personal attacks by one or more parties. *See*

https://www.urbandictionary.com/define.php?term=flaming.     According     to     AFS'
Handbook, flaming is a Major Violation of AFS' community standards.

218.    According to the Urban Dictionary, to "roast" is to humorously mock or
humiliate    someone    with    a    well-timed    joke,    diss    or    comeback.
https://www.urbandictionary.com/define.php?term=Roast. According to AFS' Handbook,
roasting in the context of the Fiend's usage is a Major Violation of AFS' community
standards.

219.    The Fiends quickly decided that merely flaming or roasting Student Doe was
not enough. Group violence was their answer – another Major Violation of AFS' community
standards. There is no mistaking the Fiends' intentions in "pulling up" which, is "[t]o
approach or confront the opposition." http://onlineslangdictionary.com/meaning-definition-
of/pull-up. Student Perpetrator makes clear that pulling up on Student Doe means physical
violence, that the Fiends will "BEAT THAT BITCH ASS." Another Fiend confirms, writing
"Bet"    which    translates    to    assent,    i.e.,    "you    bet"    in    a    response.    *See*
https://www.urbandictionary.com/define.php?term=Bet.



220.   The Fiend confirmed the plan to Student Doe. First, the Fiends went to the home of an AFS student looking for Student Doe – the same "close friend" Student Doe specifically told Miller that Student Perpetrator would target for harm in the January 28, 2020 email to Miller quoted above:







**8:01**

**Done**      **6 of 57**

‹ 130

1 (267) ▮▮▮▮▮ ›

He also talked a lot as a group about attacking you

The whole group not me at all talked a lot about like messing with you or kinda beating you up at school as a group

what did he say about attacking me

Delivered

Like to get revenge I guess

  iMessage 

221.     The Fiends' text messages confirm what AFS did not investigate -- Student Perpetrator visited Plaintiffs' home on Halloween 2019, as reported to AFS, had recruited other approximately seven other AFS students (to whom AFS did not speak as part of the investigation) – with the express intent to do physical violence to Student Doe. As alleged above, the Fiends also travelled over three miles from Plaintiffs' home to look for Student Doe at the home of another AFS classmate – the friend whom Student Doe specifically identified to Miller on January 28, 2020 that Student Doe warned would be targeted by Student Perpetrator for harm as a means of retribution against Student Doe.

222.     The "Fiend" revealed that Student Perpetrator spoke with Gerard regarding the Halloween incident, confirming that Gerard was duped and AFS's failure to investigate by failing to speak with any of the other seven Fiends who were present or request the opportunity to review any their communications about that evening, contrary to the AFS Handbook, thereby allowing the abuse, harassment and bullying to continue and remain unaddressed, contrary the obligations set forth in the AFS Handbook.



223.    As alleged above, Gerard admitted AFS failed to investigate the role of or

speak with any of the other seven Fiends who visited Plaintiffs' home with the intention of

attacking Student Doe. Instead, the conscience of a 16-year-old former Fiend revealed did what AFS failed to investigate and find, the truth regarding yet more Major Violations of AFS' Community Standards.

224.    The Fiend also revealed some of the other ways in which Student Perpetrator committed Major Violations of AFS' Community Standards toward Student Doe and which AFS failed to investigate discipline:





225.    On July 10, 2020, Student Doe posed social media proof that Student Perpetrator and several other AFS students have come to Student Doe's home to "BEAT THAT BITCH ASS":



226.    Despite the persistent policing of Student Doe's private social media by Gerard, AFS, AFS students and unnamed AFS families, AFS failed to address this act of alleged bullying and harassment as it had with respect to Student Doe's other social media posts.

**AFS' Continuing Attempts to Blame the Victim, Indifference to the Continuing Harassment of Student Doe and Failure to Investigate or Take Action as Required by the AFS Handbook**

227.    Having ignored Plaintiffs' April 20, 2020 email to Gerard, just as Student Doe's junior year was set to begin – amid the already profound disruption of returning to AFS amid Covid-19 – AFS, through Gerard, leveled yet another audacious and phony charge.

228.    Gerard sent the following (excerpted) private social media post from which Student Perpetrator was blocked and to which the "you" does not refer:





229.    Gerard cryptically claimed that a parent contacted AFS to say that the posting somehow upset AFS families, that it was a perceived intention to do harm to Student Perpetrator and that disciplinary proceedings were warranted – against Student Doe.

I hope this email finds you and [Student Doe] well. I know this summer has been a challenge for everyone, but I sincerely hope that it's been a time for everyone in your family to recharge and relax.

I am writing to you because [Student Doe] recently posted on social media regarding Student Perpetrator and their past relationship. I learned of this only recently. The parent who alerted me to the continued behavior was not able to produce any evidence, but they made it clear that [Student Doe's] online references had upset some classmates and their families.

Then, the Student Perpetrators reached out to me last week with the attached posting that had been shared with Student Perpetrator by another student. Student Perpetrator does not follow [Student Doe] on any social media and, to our knowledge, has not engaged with [Student Doe] in any way. In the TikTok video's text, [Student Doe] states "you think you can hurt my feelings my ex used to slap me with pieces of cheese and make his friends take videos." [Student Doe] also states at the bottom "no one has any idea who I'm talking about so i better not get in trouble."

Unfortunately, everyone knows who [Student Doe] is talking about, and the continued references to Student Perpetrator are not in keeping with the requests we made of both students to leave each other alone.

As we said earlier in the spring, the continued references to Student Perpetrator must stop. Without any provocation from Student Perpetrator, [Student Doe]'s behavior is online bullying because of the perceived intention to do harm to him.

Consequently, we must now engage in a disciplinary process. First, please ask [Student Doe] to remove the post from [Student Doe's] TikTok immediately. Second, I would like to find time over the next few days to meet on Zoom with you and [Student Doe] to review this situation and listen to [Student Doe's] perspective. After that discussion, we will determine what consequences should occur. Please let me know of times when we can meet.

230.    Far from under control, upon information and belief, Student Perpetrator's conduct remained out of control. Upon information and belief, during the Summer of 2020, shortly before returning to AFS, Student Perpetrator was alleged to have engaged in sexual harassment of other AFS female students.

231.    As the first day of the 2020-2021 school year approached, AFS, through its counsel, David Loder, whom AFS is believed to have retained in 2019 in response to Plaintiffs' reports, stated that AFS would not afford Student Doe any process that was required by the AFS Handbook and instead, Student Doe would be subject to summary expulsion if Student Doe made any social media posting that AFS deemed to warrant dismissal. AFS's unilateral revocation of the disciplinary procedures to which students are entitled constitutes a breach of contract between Plaintiffs and AFS and served to significantly compound the anxiety from which Student Doe was already suffering as a result of the conduct of Student Perpetrator other and AFS students.

232.    As alleged above, on April 20, 2020, Plaintiffs explicitly sought guidance from AFS regarding its expectations. That guidance was critical for Student Doe's ability to continue at AFS for at least two reasons. First, Gerard threatened that any future violation of his unarticulated standard would result in disciplinary proceedings. Second, Gerard's April 12, 2020 threats and August 27, 2020 threats do not comport with the terms of the AFS 2019-2020 Student Handbook and, therefore, are in breach or anticipatory breach of the contract between Plaintiffs and AFS.

233.    Faced with the threats from AFS, Gerard and Loder of summary discipline and a refusal to provide any guidance to Plaintiffs' since April, Plaintiffs engaged counsel to renew efforts to develop an understanding of AFS's expectations.

234.    In response, Loder informed the Plaintiffs that AFS was angry that Plaintiffs had engaged counsel to assist. Nevertheless, Plaintiffs' counsel attempted to develop a clear understanding of AFS' expectations. In response, AFS took an increasingly hard line. Inexplicably, AFS disavowed Gerard's already extreme position that the AFS would engage in some process before disciplining Student Doe (without following the process outlined in the AFS Handbook) for any future truthful, anonymized, private post regarding Student Perpetrator's abuse of Student Doe on AFS's campus. Specifically, just before the start of 2020-2021 academic year, for which Plaintiffs had already attended a Zoom Parents' Night – during which a participant displayed pornography – AFS, through Loder, disavowed Gerard's threat to discipline Student Doe for any future truthful, anonymized, private post regarding Student Perpetrator's abuse of Student Doe on AFS' campus – with some form of process.

235.    Instead, in September 2020, Loder stated that <u>AFS would not afford Student Doe any process</u>, only summary dismissal – *of Student Doe*.[5] AFS, through Loder, in breach or anticipatory breach of contract, indicated that AFS refused to provide due process, a disciplinary hearing, or an opportunity to explain Student Doe's side of the story – a complete refusal to comply with the AFS Handbook. Loder was explicit that AFS administration had solidified their decision to disregard the policies and procedures mandated in the AFS Upper School Handbook meant to address Major Violations of AFS' Community Standards. Loder also indicated that AFS would not investigate the ongoing

---

[5] AFS defines dismissal as follows: "Students who are dismissed from the school will have the option to apply for readmission after a period determined by the Head of School." Thus, Nourie, as Head of School, could establish a period of two years before Student Doe would be permitted to apply for readmission, effectively after Student Doe had graduated from high school.

harassment and bullying of Student Doe and would not apply the disciplinary procedures required by the AFS Handbook.

236.    The AFS Handbook defines Major Violations of Community Standards to include "bullying, harassment, or sexual harassment in person or on social media" and "assault." The AFS Handbook further provides that:

> When a student has violated a major community standard, the Dean of Students will convene the student-faculty Discipline Advisory Council (DAC) to recommend appropriate consequences to the Upper School Director or Head of School.

237.    The AFS Handbook only provides for "immediate expulsion" relating to sale or distribution of illegal substances or making a credible threat of deadly violence against a member of the AFS community.

238.    AFS' investigation of Student Perpetrator was not what was contemplated by the AFS Handbook, AFS failed entirely to investigate the conduct of the Fiends as reported, never followed up with addressing the Major Violations of AFS' Community Standards in accordance with the AFS Handbook, never instituted the required discipline, never held the individual students accountable for the ongoing harassment and bullying, and never brought the individual students together.

239.    Ultimately, due to the repeated peer harassment and bullying experienced by Student Doe and the deliberate indifference from AFS administrators and staff, and September 2020 threat of summary dismissal, refusal to discipline the perpetrators and refusal to comply with the terms of the AFS Handbook – and in breach or anticipatory breach of contract – with Student Doe struggling from extreme anxiety for which AFS offered no support and suffering great hardship -- Plaintiffs were left with no choice but to withdraw Student Doe from AFS.

240.    Specifically, for example, Section VII of the 2020-21 AFS Handbook, titled "Community Standards," provided that, AFS worked "to create inclusive community standards that reflect[ed] the context of different people's lives and accept[ed] various identities in our community while maintaining an environment of respect, physical and emotional safety for all members of the community." *See* Exhibit C, pg. 15.

241.    Section VII of the AFS Handbook, titled "Community Standards," also provided that, by attending AFS, students and their families agreed to abide by the community standards set forth in the Handbook. *See* Exhibit C, p. 15.

242.    Section VII of the AFS Handbook, titled "Community Standards," also enumerated "minor violations" and "major violations" of community standards and the consequences for those violations. *See* Exhibit C, pgs. 15-27.

243.    The AFS Handbook also contained a "Bullying, Harassment and Sexual Harassment" policy that provided that AFS was committed to creating a safe and supportive environment for all adults and students, and provided that bullying and harassment were not acceptable behavior for any AFS community member. *See* Exhibit C, pg. 22.

244.    According to the AFS Handbook, bullying and harassment in person or on social media are a "Major Violation" of the AFS community standards. *See* Exhibit C, pg. 17.

245.    The AFS Handbook defined "bullying" as a severe, persistent, or pervasive and intentional act or series of intentional acts directed at another student or group of students that interfered with a student's education, created a threatening environment, or substantially disrupted the operation of the school. It provided that the bullying could be in written, verbal, physical, relational, or electronic form, could occur in many types of school-

related environments, such as the classroom, on transportation, during any school-sponsored activity and online. It provided that, if an act of bullying occurred outside of a school-related environment but involved AFS students, it still fell under the jurisdiction of AFS, which Student Doe endured while at AFS. *See* Exhibit C, pgs. 22-23.

246.    The AFS Handbook also provided examples of bullying, which included but not limited to: writing or saying insulting comments or threats; spreading rumors or gossiping; and psychological manipulation or provocation – all of which were clearly applicable to what Student Doe had endured at AFS. *See* Exhibit C, pg. 23.

247.    The AFS Handbook further defined "harassment" as any behavior, intentional or not, that stigmatized, intimidated, or victimized someone for any reason, which included but were not limited to race, sex, religion, ethnicity, physical or other personal characteristics. The AFS Handbook provided that, like bullying, harassment could be in written, verbal, physical, emotional, or electronic form, and could occur across school-related environments, outside of school, and in the virtual realm - which were also applicable to what Student Doe had endured at AFS. *See* Exhibit C, pg. 23.

248.    The AFS Handbook also provided examples of harassment including, but not limited to: teasing someone because of their religion or other personal characteristics; saying or writing insulting messages about someone because of their personal characteristics; and excluding someone because of their personal characteristics – which are also applicable to what Student Doe had endured at AFS. *See* Exhibit C, pg. 23.

249.    The AFS Handbook also provided that, after a student had reported a concern or complaint about bullying or harassment to AFS, the AFS administration would initiate a prompt investigation and take appropriate action based on the circumstances, and, if bullying

or harassment were confirmed, actions could include education, counseling, suspension, dismissal, or the involvement of law enforcement, which AFS did not do. *See* Exhibit C, pg. 26.

250.    The AFS Handbook also specifically stated that when a student violated a "major" community standard, which included bullying and harassment in person or on social media, the Dean of Students would convene the student-faculty Discipline Advisory Council ("DAC"), which was comprised of trained students, trained members of the faculty, and the Dean of Students, in order to recommend appropriate consequences to the Upper School Director or Head of School. *See* Exhibit C, pg. 17. During the DAC meeting, the student would have to present his/her account of the events to the DAC. *See* Exhibit C, pg. 17. It provided that DAC members would then take into consideration all of the circumstances of a particular situation and would reach a decision by consensus and present their recommendation to the Director of the Upper School for approval. *See* Exhibit C, pgs. 17-18.

251.    The AFS School Handbook further provided that some students who appeared before DAC were placed on behavioral probation for a specified amount of time, which meant that any further violation of a major community standard could result in dismissal from school. *See* Exhibit C, pg. 18.

252.    The AFS Handbook further provided that a "typical" DAC consequence included an apology to the appropriate party or a written reflection. *See* Exhibit C, pg. 18.

253.    The AFS Handbook further provided that part of DAC's work was to "help meet the needs of the person who felt they were the victim" and to "bring healing," and therefore, provided that facilitated talks with all of the parties involved in an incident were

74

encouraged in order to facilitate conversation in order to "reach closure." *See* Exhibit C, pg. 18.

254.    Appendix A of the Upper School Handbook, titled "Non-Harassment, Non-Discrimination, Non-Retaliation, and Accommodations Policy," which was issued by AFS and was "in effect until the SBA PPP Loan ha[d] been satisfied in full," also included a "No Harassment Policy," which stated as follows: "The School is dedicated to fostering an environment that promotes kindness, acceptance and embraces differences among individuals. Therefore the School will not tolerate any type of harassment by a student, employee, or any third party…. Students should be aware that their off-campus behavior is also covered under this policy, regardless of when and where the conduct occurred or who was affected by the student's behavior. Harassment is broadly defined to include unreasonable conduct or behavior that is personally offensive or threatening, impairs morale, or interferes with the educational environment of students and includes, but is not limited to, slurs, jokes, comments, teasing, and other offensive conduct relating to race, color, age, religion, sex, national origin, handicap, or disability." *See* Exhibit C, pg. 29.

255.    The Upper School Handbook's separate "No Harassment Policy" further stated that "harassment can occur through any type of communications method, including face-to-face communications, phone, text, email, postings on social media (Facebook, Instagram, Snapchat, GroupMe, etc.), camera phones, or other forms of technology. The communications can be direct or indirect, such as through friends or others. Any such offensive conduct, whether on or off campus, on a school bus, or at a school-related event, can constitute harassment." *See* Exhibit C, pg. 30.

256.    The Upper School Handbook's separate "No Harassment Policy" further stated that, "when the School administration becomes aware of harassment, the situation will be promptly investigated as confidentially as reasonably possible. Any student found to have violated this policy will be subject to disciplinary action, including dismissal from school for serious violations, even in the case of a single expression, act, or gesture. Conduct need not meet the legal definition of harassment to violate the School's expectations for appropriate behavior and be actionable…." *See* Exhibit C, pg. 31.

257.    Additionally, AFS issued and/or published on AFS's website an SBA Non-Discrimination Compliance Policy, which clearly and unambiguously acknowledged its obligations to comply with the regulations issued by the SBA and other governmental agencies in enforcing the civil rights laws. In the SBA Non-Discrimination Compliance Policy, AFS unequivocally acknowledged its obligations to prohibit discrimination, harassment, or retaliation on the basis of race, color, national origin, age, sex, disability/handicap, or religion in its educational programs, activities, and services.

258.    The AFS Handbook also provides that "sexual harassment" includes the exact conduct of Student Perpetrator as reported to AFS, Nourie, Gerard and Miller – "target[ing] students by calling them sexually charged epithets like 'slut' or 'whore.'" *See* Exhibit C, p. 25.

259.    When AFS failed to follow its own policies related bullying and harassment by AFS students, failed to properly and promptly investigate this matter, failed to immediately acknowledge and publicly label the individual AFS students' actions toward Student Doe, as described above, as bullying and harassment, and failed to promptly take appropriate actions based on the circumstances, it violated the Upper School Handbook and

other written school policies, and breached its contract with the Student Doe and Student Doe's family.

260.    When AFS failed to follow its written rules and procedures and failed to provide any consequences to the AFS students who committed major violations of the community standards, including Student 1, Student 2, and Student 3, AFS violated the Upper School Handbook and breached its contract with the Family.

261.    As a direct result of the failure of AFS and the Individuals to comply with AFS's Upper School Handbook, failure to take prompt and effective steps reasonably calculated to end the harassment, failure to eliminate any hostile environment and its effects, failure to prevent the bullying and harassment from recurring, perpetuation of harassment relating to Student Doe's sexual orientation and failure to offer any support the profound and increasing anxiety which Plaintiffs had reported to AFS and which was exacerbated by the events complaint of herein -- Student Doe suffered and continues to suffer from increased stress and anxiety which has manifested itself in significant and ongoing physical and emotional injuries, aggravation of an eating disorder, requiring ongoing psychological treatment, as well as other ongoing physical effects from the anxiety medication that Student Doe has been prescribed.

262.    Student Doe has suffered emotional trauma by the adult individuals who had a duty to educate Student Doe, to keep Student Doe safe, and to protect Student Doe and to apply the disciplinary procedures in the AFS Handbook.

263.    Student Doe treated with a private therapist for the psychological and emotional injuries resulting from the harassment and bullying from Student Perpetrator and

other AFS students, and the consistent and unchecked bullying and harassment that followed thereafter at AFS.

264.    The physical and mental effects of the harassment and bullying to which Student Doe was subjected at AFS have also necessitated ongoing treatment by a psychiatrist.

265.    Plaintiffs suffered economic losses as a result of Student Doe's injuries, including but not limited to, (i) all tuition, costs, and fees paid to AFS during the 2018-2019, 2019-20 and 2020-21 school years; (ii) all fees and costs paid to a tutor as a result of AFS's conduct during the 2019-20 and 2020-21 school years; (iii) all fees and costs paid for therapy, counseling, and/or medical, psychological and psychiatric care required as a result of AFS's conduct; and (iv) all fees and costs to be paid for further therapy, counseling and/or medical, psychological and psychiatric care required as a result of AFS's conduct.

### CAUSES OF ACTION

<u>**Count I – Breach of Contract**</u>
**Plaintiffs Student Doe, Mother Doe, and Father Doe**
**v. Defendant Abington Friends School**

266.    Plaintiffs incorporate by reference all preceding paragraphs as if fully restated in this paragraph.

267.    Plaintiffs had a contractual relationship with AFS, either express or implied.

268.    Upon information and belief, Plaintiffs and AFS were parties to enrollment agreements for the 2018-2019, 2019-20 and 2020-21 school years at AFS, which are binding contracts.

269.    The parties' enrollment contracts, either express or implied, as outlined above, incorporated the terms of AFS's Handbooks and other AFS written school policies,

and Plaintiffs became entitled to all the rights conferred by the promises in the enrollment contracts, AFS Handbooks and other written school policies.

270.    Plaintiffs had a reasonable expectation that AFS would adhere to the terms of this contract, as contained in the enrollment contract, the AFS Handbooks, and other AFS written school policies.

271.    Specifically, in its Upper School Handbook, AFS promised that it would work "to create inclusive community standards that reflect[ed] the context of different people's lives and accept[ed] various identities in our community while maintaining an environment of respect, physical and emotional safety for all members of the community." See Exhibit C, pg. 15.

272.    In its Handbook, AFS also promised that AFS was committed to creating a safe and supportive environment for all adults and students and promised that bullying and harassment by any AFS community member were not acceptable behaviors that would be tolerated at AFS. See Exhibit B, pg. 22.

273.    In AFS's "Non-Harassment, Non-Discrimination, Non-Retaliation, and Accommodations Policy," which was included as Appendix A of the Upper School Handbook, AFS also promised that AFS was "dedicated to fostering an environment that promote[d] kindness, acceptance and embrace[d] differences among individuals," and that AFS would "not tolerate any type of harassment by a student," whether on or off-campus. See Exhibit B, pg. 29.

274.    In section VII of the AFS's Handbook, titled "Community Standards," AFS enumerated "minor violations" and "major violations" of community standards and

promised to provide certain consequences and to follow certain procedures for those violations. See Exhibit B, pgs. 15-27.

275.    In its Handbook, AFS promised that, after a student had reported a concern or complaint about bullying or harassment to AFS, the AFS administration would initiate a prompt investigation and take appropriate action based on the circumstances, and, if bullying or harassment were confirmed, actions could include education, counseling, suspension, dismissal, or the involvement of law enforcement. See Exhibit B, pg. 26.

276.    In its Handbook, AFS promised that when a student violated a "major" community standard, which included bullying and harassment in person or on social media, the Dean of Students would convene the student-faculty Discipline Advisory Council ("DAC"), which was comprised of trained students, trained members of the faculty, and the Dean of Students, in order to recommend appropriate consequences to the Upper School Director or Head of School. See Exhibit B, pg. 17.

277.    In its Handbook, AFS promised that DAC would work to "help meet the needs of the person who felt they were the victim" and to "bring healing," and therefore, encouraged facilitated talks with all of the parties involved in an incident in order to "reach closure." See Exhibit B, pg. 18.

278.    AFS' its "Non-Harassment, Non-Discrimination, Non-Retaliation, and Accommodations Policy," which was included as Appendix A of its Handbook, AFS promised that, when AFS administration became aware of harassment, "the situation will be promptly investigated as confidentially as reasonably possible" and that "[a]ny student found to have violated this policy w[ould] be subject to disciplinary action, including

dismissal from school for serious violations, even in the case of a single expression, act, or gesture." *See* Exhibit C, pg. 31.

279.    Plaintiffs, in reliance on AFS's promises, paid AFS in full all tuition, costs, and other related fees, as requested by AFS, for Student Doe's 8th and 9th grade years at AFS during the 2019-20 and 2020-21 school years.

280.    By its and its employees' actions as described more fully herein, AFS breached those promises and breached AFS's contract with Plaintiffs or anticipatorily breach by:

     a.   Failing to follow the policies and procedures in the Upper School Handbook related to major violations of community standards, including convening the student-faculty Discipline Advisory Council (DAC) and providing consequences to the AFS students, including but not limited to Student Perpetrator and the other AFS students, who bullied and harassed Student Doe;

     b.   Failing to follow the policies and procedures in the Upper School Handbook in response to ongoing complaints and reports of bullying and harassment of Student Doe;

     c.   Failing to follow the policies and procedures in the Upper School Handbook related to bullying and harassment, including failure to promptly take appropriate actions based on the circumstances;

     d.   Failing to immediately acknowledge and publicly label the individual students' actions toward Student Doe, as described above, as bullying and harassment;

e.   Intentionally choosing to protect the students who were bullying and harassing Student Doe, at Student Doe's expense, by minimizing and ignoring the other AFS students' conduct that was in violation of community standards;

f.   Failing to impose prompt and effective remedial and safety measures reasonably calculated to end the ongoing bullying and harassment of Student Doe at AFS, to eliminate the hostile environment and its effects, and to prevent the harassment and bullying from recurring;

g.   Failing to report illegal or potentially illegal conduct to law-enforcement authorities;

281.   AFS's failures constitute material breaches of the express and implied terms of the parties' contract.

282.   Plaintiffs have been damaged as a result of these breaches in an amount to be determined at trial.

283.   Those damages include, without limitation, (i) all tuition, costs, and fees paid to AFS during the 2019-20 and 2020-21 school years; (ii) all fees and costs paid to a tutor as a result of AFS's conduct during the 2019-20 and 2020-21 school years; (iii) all fees and costs paid for therapy, counseling and/or medical, psychological and psychiatric care required as a result of AFS's conduct; and (iv) all fees and costs to be paid for further therapy, counseling and/or medical, psychological and psychiatric care required as a result of AFS's conduct.

WHEREFORE, Plaintiffs demand judgment for compensatory and consequential damages against Defendant Abington Friends School in an amount to be determined at trial together with court costs, attorneys' fees, interest, and all other relief permitted by the Court.

**Count II – Violation of Title IX**
**Plaintiffs Student Doe, Mother Doe, and Father Doe**
**v. Defendant Abington Friends School**

284.    Plaintiffs incorporate by reference all preceding paragraphs as if fully restated in this paragraph.

285.    Title IX of the Education Amendments of 1972 provides, with certain exceptions, that "[n]o person in the United States shall, on the basis of sex, be excluded from participation in, be denied the benefits of, or be subject to discrimination under any education program or activity receiving Federal financial assistance." 20 U.S.C. § 1681(a).

286.    AFS is exempt from federal income taxes under Section 501(c)(3) of the Internal Revenue Code, which constitutes federal financial assistance for the purposes of Title IX. *See E.H. ex rel. Herrera v. Valley Christian Acad.*, 616 F.Supp.3d 1040, 1049-50 (C.D. Cal. 2022); *Buettner-Hartsoe v. Balt. Lutheran High Sch. Ass'n*, No. CV RDB-20-3132, 2022 WL 2869041, at *5 (D. Md. July 21, 2022), appeal docketed, No. 23-1453 (4th Cir. Apr. 27, 2023).

287.    Starting on May 24, 2019 and through the summer of 2020, AFS and its officials had actual knowledge of the fact that Student Perpetrator consistently subjected Student Doe to severe and pervasive sex-based harassment, including physical and verbal assaults.

288.    Specifically, AFS and its officials had actual knowledge that Student Perpetrator, sometimes in coordination with other AFS students, spread false sexual rumors about Student Doe, spread rumors about Student Doe's body, called Student Doe a "slut," "fat slut" and "whore," threatened to rape Student Doe's minor sister if [Student Doe] broke up with Student Perpetrator, made social posts mocking Student Doe's abuse and sexual orientation, and bragged that Student Perpetrator turned Student Doe into a lesbian. This was discrimination "on the basis of sex" such that it is subject to Title IX.

289.     AFS, through its officials and their multiple meetings with Plaintiffs, had actual knowledge of the relationship abuse and subsequent sex-based harassment, and had the authority to take corrective action, as the abuse and harassment occurred under circumstances wherein AFS exercised substantial control, including on its own campus. Yet AFS failed to take any steps to address the hostile educational environment created by the sex-based harassment.

290.     Specifically, AFS failed to offer counseling to Student Doe, make any changes to Student Doe's or Student Perpetrator's schedules to keep them separated despite promising to do so, meet with Student Perpetrator's parents to discuss his sexual harassment and abuse of Student Doe, or otherwise follow the policies of its Handbook in any capacity.

291.     Furthermore, in spite of its knowledge of the severe and pervasive harassment Student Doe reported, and its authority and control over the perpetrators, AFS and its officials failed to investigate the ongoing sex-based harassment, discipline the wrongdoers, or provide appropriate accommodations.

292.     To the contrary, AFS placed Student Perpetrator in direct contact with Student Doe in its classrooms and eventually blamed *Student Doe* for defending against the abusers and AFS threatened Student Doe with dismissal without the process required by the AFS Handbook.

293.     AFS was thus deliberately indifferent to Student Doe's repeated reports of sex-based harassment, despite their authority and ability to address the continued harassment. Their response was clearly unreasonable in light of the known circumstances.

294.     ASF and its officials' deliberate indifference subjected Student Doe to sex-based harassment so severe, pervasive, and objectively offensive that Student Doe was denied equal access to educational opportunities, resources, and benefits. ASF's deliberate indifference caused

Student Doe to miss classes, lose interest in Student Doe's education, and was in constant fear as [Student Doe] regularly encountered the harassers on campus.

295.    Ultimately, AFS and its officials directly caused Student Doe to withdraw from AFS and receive inferior educational opportunities.

296.    As a direct and proximate result of AFS's deliberate indifference, Student Doe has suffered emotional distress and psychological trauma for which Student Doe is entitled to be compensated.

WHEREFORE, Plaintiffs demand judgment for compensatory, consequential, and punitive damages against Defendant Abington Friends School in an amount to be determined at trial together with court costs, attorneys' fees, interest, and all other relief permitted by the Court.

### Count III – Discrimination in Violation of Section 504 of the Rehabilitation Act
**Plaintiffs Student Doe, Mother Doe, and Father Doe**
**v. Defendant Abington Friends School**

297.    Plaintiffs incorporate by reference all preceding paragraphs as if fully restated in this paragraph.

298.    AFS has intentionally, purposefully, and with deliberate indifference violated the rights of Student Doe under Section 504 of the Rehabilitation Act.

299.    Section 504 of the Rehabilitation Act, 29 U.S.C. § 794 *et seq,* and its implementing regulations, 34 C.F.R. Part 104 *et seq*. require that qualified individuals with disabilities not be excluded from the participation in, be denied the benefits of, or be subject to discrimination by a recipient of federal financial assistance. Failure to provide accommodations and supplemental services constitutes discrimination for purposes of Section 504.

300.    Student Doe is an individual with a disability under Section 504 – i.e., anxiety.

301.     Student Doe was otherwise qualified to participate in all school programs and activities.

302.     During all relevant times, AFS offered programs and activities that received federal financial assistance.

303.     Specifically, AFS is exempt from federal income taxes under Section 501(c)(3) of the Internal Revenue Code, which constitutes federal financial assistance. *See E.H. ex rel. Herrera v. Valley Christian Acad.*, 616 F.Supp.3d 1040, 1049-50 (C.D. Cal. 2022); *Buettner-Hartsoe v. Balt. Lutheran High Sch. Ass'n*, No. CV RDB-20-3132, 2022 WL 2869041, at *5 (D. Md. July 21, 2022), appeal docketed, No. 23-1453 (4th Cir. Apr. 27, 2023).

304.     Although AFS had knowledge that Student Doe was a student with anxiety, entitling Student Doe to protection under Section 504 of the Rehabilitation Act, AFS excluded Student Doe from participation in and denied Student Doe the benefit of its services, programs, and activities and otherwise discriminated against Student Doe based on Student Doe's disability by not evaluating Student Doe, by not convening a Section 504 meeting, by not issuing a Section 504 Plan or Accommodation Plan in order to accommodate Student Doe's disabilities at any time during the 2019-20 school year, and by not providing Student Doe with accommodations and supplemental services in violation of its obligations under Section 504 of the Rehabilitation Act and its implementing regulations.

305.     AFS acted intentionally or with deliberate indifference toward Student Doe's federal rights.

306.     AFS knew that a federally protected right was substantially likely to be violated and failed to act despite that knowledge.

307.     AFS's failures continued throughout the 2019-20 school year, despite AFS's knowledge of the ongoing harm being suffered by Student Doe, including the increase in Student Doe's anxiety and anxiety related symptoms as a result of AFS's conduct.

308.     Plaintiffs have suffered and continue to suffer damages including but not limited to humiliation, mental anguish, pain and suffering, and loss of educational benefit.

WHEREFORE, Plaintiffs demand judgment for compensatory, consequential, and punitive damages against Defendant Abington Friends School in an amount to be determined at trial together with court costs, attorneys' fees, interest, and all other relief permitted by the Court.

**Count IV – Negligent Infliction of Emotion Distress**
**Plaintiffs Student Doe, Mother Doe, and Father Doe**
**v. Individual Defendants Richard Nourie, Dominque M. Gerard, LaToya Miller, and Kevin Ryan**

309.     Plaintiffs incorporate by reference all preceding paragraphs as if fully restated in this paragraph.

310.     Plaintiffs' claim of Negligent Infliction of Emotional Distress is pled in the alternative to Plaintiffs' claim for breach of contract to the extent that an Individual Defendant was not acting in the scope of his or her employment by AFS as to the acts alleged herein.

311.     At all relevant times, Individual Defendants had a pre-existing duty of care, either through contract, fiduciary duty, and/or special relationship, to ensure Student Doe, as an enrolled student at AFS, was safe from AFS students and/or while on AFS premises.

312.     Individual Defendants breached that duty as set forth in detail above.

313.     Specifically, Individual Defendants failed to offer counseling to Student Doe, make any changes to Student Doe's or Student Perpetrator's schedules to keep them separated despite promising to do so, meet with Student Perpetrator's parents to discuss his sex-based

harassment and abuse of Student Doe, investigate the ongoing sex-based harassment, discipline the wrongdoers, or provide appropriate accommodations.

314.    By allowing Student Doe to be placed in continued way of harm, harassment, and a hostile environment, Individual Defendants breached the duty of care they owed to Student Doe with respect to her safety and general well-being.

315.    Moreover, Individual Defendants breached their fiduciary duty by failing to abide by the procedures explicitly set forth in the Upper School Handbook.

316.    As a direct and proximate result of Individual Defendants' breach, Student Doe suffered physical impact, namely the physical abuse inflicted by Student Perpetrator on AFS premises.

317.    As a direct and proximate result of Individual Defendants' breach, Student Doe was placed in a zone-of-danger, namely being surrounding by Student Perpetrator and other AFS students on AFS premises and placed in actual fear that they would cause her physical harm.

318.    As a direct and proximate result of Individual Defendants' breach, Student Doe suffered physical and psychological trauma and severe and permanent psychological damage and emotional distress.

319.    Student Doe has received and continues to receive therapy and psychiatric care for the trauma Student Doe suffered while a student at AFS, giving rise to further damages.

320.    Parents have also suffered severe and permanent psychological damage, emotional distress, and compensatory damages as a proximate cause of Individual Defendants' breach.

WHEREFORE, Plaintiffs demand judgment for compensatory, consequential, and punitive damages against Defendant Abington Friends School in an amount to be determined at trial

together with court costs, attorneys' fees, interest, and all other relief permitted by the Court.

### JURY DEMAND

A trial by jury is demanded as to all claims.

Respectfully submitted,

**DILWORTH PAXSON LLP**

By:  /s/ Jerry DeSiderato
Jerry R. DeSiderato, Esquire
Attorney I.D. No. 201097
1500 Market Street, Suite 3500E
Philadelphia, PA  19102
Phone:  (215) 575-7000
Fax: (215) 754-4603
jdesiderato@dilworthlaw.com

Date:  March 14, 2024